2016 IL App (4th) 130180-B
NO. 4-13-0180

FILED
August 4, 2016
Carla Bender
4th District Appellate
Court, IL

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Champaign County |
| MARVINO MISTER, | ) | No. 12CF611 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Thomas J. Difanis, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE KNECHT delivered the judgment of the court, with opinion.
Justices Turner and Pope concurred in the judgment and opinion.

**OPINION**

¶ 1 In December 2012, a jury found defendant, Marvino Mister, guilty of armed robbery (720 ILCS 5/18-2(a)(2) (West 2010)). In January 2013, the trial court sentenced him to 30 years' imprisonment with credit for 276 days served. Defendant appealed, arguing (1) plain error occurred where a witness's testimony violated the silent witness theory, (2) plain error occurred where the trial court gave incorrect jury instructions, (3) trial counsel was ineffective, (4) the State failed to prove him guilty of armed robbery, and (5) fines imposed by the circuit clerk are void and he is entitled to $1380 in presentence credit. In January 2015, we affirmed in part, vacated in part, and remanded with directions. *People v. Mister*, 2015 IL App (4th) 130180, 27 N.E.3d 97. Defendant filed a petition for leave to appeal with the Supreme Court of Illinois.

¶ 2 On March 30, 2016, the supreme court denied defendant's petition for leave to appeal but issued a supervisory order (*People v. Mister*, No. 118934 (Ill. Mar. 30, 2016)

(nonprecedential supervisory order)) directing this court to vacate our prior judgment and reconsider our decision in light of *People v. Thompson*, 2016 IL 118667, 49 N.E.3d 393. In accordance with the supreme court's direction, we vacate our prior judgment and reconsider in light of *Thompson* to determine whether a different result is warranted. We again affirm in part, vacate in part, and remand with directions.

¶ 3                                    I. BACKGROUND

¶ 4        On April 18, 2012, the State charged defendant by information with armed robbery (720 ILCS 5/18-2(a)(2) (West 2010)), a Class X felony. The information alleged on April 12, 2012, defendant took money from Sean Harrigan, a student at the University of Illinois in Champaign-Urbana, by threatening the imminent use of force while armed with a silver gun.

¶ 5                                 A. The Evidence at Trial

¶ 6        On December 4, 2012, defendant's jury trial commenced. At trial, Sean Harrigan testified that on April 11, 2012, he and his two friends, Arman Agarwal and James Ramelli, drove in Harrigan's car to Par-A-Dice Hotel and Casino in Peoria, Illinois. They arrived around 7:30 or 8 p.m. Harrigan played craps the entire night and into the early morning hours of April 12, 2012. Agarwal and Ramelli also played craps, but after four or five hours they left to play poker. Harrigan ended up winning $23,000 and was paid in "two bricks" of $10,000, and the remaining $3,000 was placed in a white envelope. At 4:29 a.m., a security guard escorted Harrigan, Agarwal, and Ramelli to Harrigan's car, which was parked in the casino's parking lot. Harrigan saw nothing suspicious while playing craps or walking to his car.

¶ 7        The trio left the casino, stopped at a nearby gas station, and purchased sodas for the ride home. Agarwal and Ramelli went inside the gas station while Harrigan remained in his car. Harrigan then drove onto Interstate 74 toward Champaign and did not make any stops along the way; he estimates it took 1 hour and 20 minutes to drive home. Harrigan did not notice anything suspicious at the gas station or during the ride home.

¶ 8        Around 6 a.m., Harrigan drove into an underground parking garage at his apartment at 512 South Third Street in Champaign. He parked near the north end of the garage, and Agarwal and Ramelli exited the passenger side of the vehicle. Harrigan retrieved his winnings from the glove compartment, opened the driver's side door, and prepared to exit the vehicle. He had one foot out of the vehicle when he noticed a black male quickly approaching. Harrigan put the majority of his winnings behind him and "sat on it"; he had about $2500 in a money clip, which was in his pants pocket. The man brandished a silver revolver with a "short barrel," pointed it at Harrigan, and demanded the money. He also pointed it at Agarwal and Ramelli, who were standing with their hands up next to the passenger side of the vehicle. Harrigan testified the man kept saying, "give me the bread," "I know you have money," and "if you don't give me the money, I'm going to start shooting." Harrigan gave the man his cell phone and money clip containing his driver's license, casino card, and $2500, but the man said he knew there was more and threatened to shoot. Harrigan testified a white or gray car pulled down the entrance ramp into the parking garage, and the robber took off running toward the car. Harrigan assumed the robber and car were related because the robber seemed determined to get the money, but when the car showed up, the robber looked at it and then left, heading toward the car. Harrigan, Agarwal, and Ramelli ran upstairs to Harrigan's apartment and called the police.

¶ 9 Harrigan described the offender to police as a 5-foot-10-inch, 180-pound black male in his early twenties. The man "had a dark sweatshirt, no hood, and dark jeans." His hair was short and braided into "little tips" on the side and back of his head. When asked about the man's facial hair, Harrigan said, "[i]t was short, pretty, pretty trim, you know, light mustache, went you know, scooped the whole chin up to the ear."

¶ 10 Later in the afternoon, police detectives showed Harrigan a photographic array of six possible suspects. Harrigan told the detectives he was "80 to 85 percent sure" the man in picture two, defendant, was the offender. However, he initialed next to instruction No. 9b, which states: "I do not recognize anyone from these photos as the suspect." Harrigan did not make an in-court identification of defendant.

¶ 11 Harrigan stated, prior to testifying, he viewed footage depicted on the casino's surveillance video and it truly and accurately depicted the images of what happened at the casino. The State then presented a compact disc (CD), which contains five video clips, and played the first clip for the jury. The video is taken from a camera on top of the hotel's roof and overlooks the casino's parking lot. The recording is in color, has no sound, and is time-stamped 4:29:35 a.m. The picture quality is fair. At 4:30 a.m., the camera pans toward the casino and zooms in on four individuals who are walking out of the casino toward the parking lot. Harrigan testified the individuals are himself, Ramelli, Agarwal, and a casino security guard. Approximately 10 seconds later, a white male wearing a blue jacket, blue jeans, white shoes, and dark baseball hat exits the casino. Seconds later, one of Harrigan's friends turns around and walks back toward the casino. The white male briefly walks out of the camera's range but reappears when the camera zooms out. Although the camera follows Harrigan's escort through the parking lot, the white male appears at the top right portion of the video and enters the driver's

door of a silver four-door sedan. The video shows Harrigan, his friend, and the security guard approach Harrigan's vehicle. They stand next to the vehicle, appear to have a conversation, and after 25 seconds, the security guard walks back toward the casino. Approximately 16 seconds later, Harrigan's other friend left and walked toward the direction of the casino. Harrigan entered his vehicle and waited for his two friends, who returned a few minutes later. Harrigan's vehicle drove away at 4:33 a.m.

¶ 12　　　　The State introduced still photographs taken from various surveillance cameras located inside the casino. Harrigan testified the photographs fairly and accurately depict what he was wearing (a plaid shirt and blue jeans). One group contains seven pages of color photographs and shows Harrigan standing at the craps table. We note each page is divided into four quadrants showing a different area of the casino. The images are grainy and of poor quality. The craps table is shown in the bottom right quadrant. A second group of 10 photographs shows a security guard escorting Harrigan, Agarwal, and Ramelli through the security turnstiles. The first four photographs show Harrigan's security escort, and the remaining six photographs depict a white male following 11 seconds behind Harrigan's escort.

¶ 13　　　　Arman Agarwal testified to a similar sequence of events as Harrigan. On April 11, 2012, Harrigan drove Agarwal and Ramelli to Par-A-Dice casino. Agarwal played craps at the same table as Harrigan and Ramelli but stood at the opposite end of the table. He did not talk to anyone while playing craps. After four hours, Agarwal and Ramelli left the craps table and went to the third floor to play poker. Agarwal returned to the craps table "once or twice" and was there when Harrigan won $23,000. When asked how the crowd was acting, Agarwal stated, "[e]veryone was kind of happy. It was a peppy environment." Agarwal and Ramelli accompanied Harrigan to the cashier, and they left the casino together. Agarwal testified they

stopped at a gas station, and he got out of the car to "get some drinks." During the ride home, they stayed awake and "talked the entire way back" to Champaign. When asked if he was watching to see if anything suspicious was happening, Agarwal testified, "No. We were too caught up in the moment."

¶ 14        Upon their return to Champaign, Harrigan parked in the garage at 512 South Third Street. Agarwal and Ramelli exited the car when a man walked up, pointed a gun at Harrigan's head, and said, "give me that bread." The man also pointed the gun at Agarwal and Ramelli, who were standing next to the passenger side of the car. Agarwal testified Harrigan gave the man some money, but the man replied, "I know there's more." At this time, however, Agarwal noticed a white or gray four-door sedan entering the parking garage. He testified the car "took a left, same way we did. It was hovering there. And [the man] looked back, he saw the car, and he kind of—I think he got spooked maybe." The man fled toward the garage entrance and Agarwal, Harrigan, and Ramelli ran upstairs and called the police. Agarwal described the man as 5 feet, 8 inches tall, African-American, with short braided hair, and wearing "a gray hoody and pants." He described the gun as a small revolver with a silver barrel.

¶ 15        The State called James Simmons to the stand. Simmons testified he works as a surveillance shift supervisor for Boyd Gaming Corporation at Par-A-Dice Hotel and Casino. He has worked in that capacity for seven years and received specialized training for the position. His responsibilities include monitoring the casino and hotel, following money, "determin[ing] the play of the games," and watching "people trying to cheat the casino."

¶ 16        Simmons testified he is familiar with the entire property comprising Par-A-Dice Hotel and Casino. The State introduced an aerial view of the property, which is composed of three parking lots, two buildings, and a large boat docked on Peoria Lake. Blackjack Boulevard

is the main road leading through the property. Simmons explained the hotel is located in a separate building from the casino and has its own parking lot. A second parking lot is for valet, and the third parking lot is for the casino. The casino is located in the boat. To get to the boat, patrons must enter the pavilion. The pavilion has a lobby, several restaurants, security turnstiles, and two ramps leading to the boat. One ramp is for employees, the other for guests, and both ramps are located over water. Simmons testified a Shell gas station is located across the street from Par-A-Dice.

¶ 17        Simmons's testimony consisted of providing foundation for the surveillance videos. He said the casino and hotel have more than 450 cameras, which are located both inside and outside. The casino has two digital systems and one analog system, which is video home system (VHS) tape. The surveillance room is always staffed, and access is limited to the Illinois Gaming Board and Boyd Gaming surveillance employees. Simmons explained how the surveillance system operates, how recordings are preserved, and how they identify cameras that need to be repaired or replaced. The surveillance system allows Simmons to watch live feeds, use multiple cameras to track movement through the casino, watch and make copies of past recordings, and take digital video snapshots (still photographs). The surveillance system also has "quads that will record 4 shots on one tape or sequencers that record 16 cameras on one tape." Every month, a technician reviews the time stamps on each camera to ensure they are within 20 seconds of each other.

¶ 18        On April 12, 2012, at 9:10 a.m., Simmons was advised a casino patron was robbed upon returning home to Champaign. Simmons reviewed the surveillance footage and observed a white male "walking out slowly behind [Harrigan's] group as they were escorted out to their vehicle." Simmons quickly identified John Williamson, the white male, as a possible

suspect. When asked how he learned the white suspect's identity, Simmons explained patrons who appear to be 30 years old and under are asked to produce valid government-issued identification. The surveillance system, located at the security turnstiles, takes still photographs of the individual and their government-issued identification, and it records the date and time the pictures were taken.

¶ 19 Simmons sent photographs of Williamson and his Illinois identification (ID) card to the Champaign police department. Shortly thereafter, Simmons was informed a black male carried out the robbery. In response, Simmons testified, "[w]e started looking at Williamson's activities in the casino and on the floor until we observed a black male who was *** with Williamson." Simmons identified the black male, Marvino Mister, as a possible suspect and forwarded pictures of him and his state ID card to Champaign police.

¶ 20 The State introduced, without objection, color photographs of Williamson, Mister, and the ID cards they presented at the security turnstiles. The images are good quality. People's exhibit No. 16 contains two photographs, which are time-stamped "04/11/2012 11:15:55 PM." The top photograph shows an Illinois ID card with the name "John K Williamson." The bottom photograph shows Williamson looking at the security camera. He is a white male, has buzzed hair, and is wearing a white T-shirt and navy blue jacket with a white star on his left shoulder and "YALE" printed across the chest. People's exhibit No. 17 contains two photographs, which are time-stamped "4/12/2012 12:04:59 AM." The top photograph shows an Illinois ID card with the name "Marvino R Mister." The bottom photograph shows Mister looking at the security camera. He is a black male, has braided hair, has light facial hair, and is wearing a black T-shirt and sweater.

¶ 21     Simmons further testified he copied surveillance footage from the casino onto two digital video discs (DVDs). Footage from the hotel's surveillance system was copied onto a CD. He forwarded these recordings to the Champaign police department. Simmons testified there were no errors in the recording system, and he did not alter or delete any portions of the recordings. Although Simmons did not personally observe the events depicted in the surveillance recordings, he testified they fairly and accurately portray what happened from April 11, 2012, to April 12, 2012.

¶ 22     The State introduced the DVDs and CD into evidence without objection and published them to the jury. The recordings contain 3 hours, 49 minutes of surveillance footage and cover a time period from 11:15 p.m., April 11, 2012, to 4:38 a.m., April 12, 2012. The video is captured from numerous cameras, both inside and outside the casino, and has an aspect ratio of 4:3, which is comparable to an old-format television. Each portion of video is imprinted with a time stamp, allowing the viewer to ascertain the exact time of events among multiple cameras. Some portions of video have two time stamps, showing the time of the events depicted on the video and the time Simmons viewed the recording. Surveillance video from inside the casino is in color, has good picture quality, and has no sound. Some portions of video, however, are captured from "quads," or groups of four cameras, and the image quality is grainy and poor. Video of the casino parking lot is black and white and has no sound, and the picture quality is poor. Surveillance video from the hotel is in color and has no sound, and the picture quality is fair. The State also introduced 135 pages of still photographs, made from the surveillance videos, which were published to the jury without objection.

¶ 23    During Simmons's testimony, the State played portions of the surveillance video for the jury and asked him to describe the layout of the casino and what he was trying to capture in each clip. For example, the following colloquy occurred:

"BY MS. CLARK: Mr. Simmons, I paused it at 12:00. When we're looking at this set of quads, which does not show the craps table, what are we looking at in the lower right-hand corner?

A. That is the main aisle camera for most of the second deck of the casino towards the front of the boat. Williamson has just started walking toward it to exit the vessel.

Q. Okay. And that's why you recorded this particular—

A. Yes.

Q. —set?

And when we're looking at this portion of video, which will appear again, what are we looking at here?

A. That's the entrance of the casino from the guest ramp at the very front of the boat.

Q. Okay. This long ramp or hallway, those are the same ramps that we saw on the overhead picture that would have been white?

A. Yes."

¶ 24    Additionally, although Simmons did not personally observe the events depicted on the surveillance video as they occurred, the State asked him to narrate portions of the video. For example, the following dialogue occurred:

"BY MS. CLARK: Okay. Now I've stopped it at 11:18. Where on this video is the person that you've identified as John Williamson at on this video?

A. He is on the—from our angle, the far side of the corner of the craps table.

Q. Where did you identify the victim as having played at that night?

A. The victim is at the left end of the table, partially blocked with a pillar that's on the screen right now. And that's him kind of leaning in past the pillar.

Q. Now from 11:18 you recorded this particular view until 11:58. During this time, did John Williamson play at this craps table?

A. Yes.

Q. And does the victim play at this craps table?

A. Yes.

* * *

Q. I'm now pausing at 12:07. Who can you identify in this portion of the recording?

A. That's Williamson and Mister both walking inside the casino.

Q. Okay. Is this first time that Mister appears on your recordings?

- 11 -

A. Yes.

Q. Okay. And this hallway that he has come from, what is at the end of it?

A. The turnstiles where security is.

\* \* \*

Q. Okay. At 12:11 you took another recording. Who can you identify on the video at this time?

A. Williamson is getting ready to walk off of that camera shot towards the left side of the screen.

Q. To go back down the aisle?

A. Towards the front, yes.

Q. Okay.

A. And that's Mister walking up to the table.

Q. Okay. Again, this is the same table that Sean Harrigan is at at that time?

A. Yes."

¶ 25 Throughout his testimony, the State asked Simmons how he was able to identify the individuals depicted in the footage. Simmons testified he was able to follow the suspects through the casino based on their clothing, gait, the way they walk, and how "it just flows to the next camera." Other times, Simmons could see a suspect's face. The State also asked Simmons how he was able to identify the individuals depicted in the black-and-white surveillance video, which is grainy and poor quality:

"Q. Now this particular video, the black-and-white video, it's hard for you to identify exactly who is there at that point based upon the black and white?

A. It's a little tougher, yes.

Q. Okay. Was there any way for you to distinguish?

A. The coat that Williamson had on and then the other camera at the pavilion when they actually went inside you'll see a little better and be able to tell who it is.

Q. When you're dealing with the black-and-white version, is there a way that you were able to distinguish?

A. Other than the coat, not really.

* * *

Q. Why did you identified [*sic*] it this time as Williamson?

A. His white T-shirt hanging out at the bottom there and the height."

¶ 26        We note, throughout his testimony, Simmons referred to the two suspects by name, which appeared on the ID cards they presented to security upon entering the casino. Simmons's testimony sought to establish the individuals depicted in the still photographs are the same individuals who appear on the video recordings. Simmons's testimony was introduced to track Williamson's and Mister's movements through the casino and determine whether they left the casino in the same car. Simmons did not make a direct in-court identification of defendant; that is, he never testified any of the individuals depicted in either the still photographs or the surveillance video was defendant, seated at a specific location in the courtroom.

¶ 27        In general, Simmons testified the surveillance videos show Williamson enter the casino at 11:15 p.m. He plays craps at the same table as Harrigan. At 12 a.m., midnight, he leaves the craps table and walks toward the security turnstiles. Defendant enters the casino at 12:04 a.m. At 12:07 a.m., defendant and Williamson walk into the casino and stand next to each other as they play craps at the same table as Harrigan. At 1:55 a.m., they leave the craps table and walk toward "the restrooms and the smoking area." Although Williamson and defendant stop gambling, surveillance footage shows them exit the casino and enter a silver Pontiac Bonneville, which is parked in the casino parking lot. Simmons testified they enter and exit the silver Bonneville "at different points throughout" the night and take turns walking through the casino past the craps table. At 2:30 a.m., the silver Bonneville drives to the other side of the parking lot, where it remains for some time. Williamson leaves the casino at 3:16 a.m., but this time, he walks "to the other side of the parking lot," where the car had moved. Around 3:40 a.m., the silver Bonneville returns near its original parking spot. At 4:01 a.m., defendant exits the passenger side of the vehicle and walks toward the casino but does not enter the pavilion. Instead, he returns to the silver Bonneville and enters the passenger side door at 4:03 a.m. At 4:27 a.m., Williamson exits the driver's side of the vehicle and enters the casino at 4:28 a.m. At 4:29 a.m., Williamson walks past Harrigan's escort. He waits approximately 14 seconds before turning around to follow Harrigan out of the casino. At 4:30 a.m., Williamson exits the casino 11 seconds after Harrigan, walks to the silver Bonneville, and enters the driver's side door. At 4:32 a.m., the silver Bonneville leaves the casino parking lot and circles around the hotel parking lot. Two minutes later, Harrigan's car leaves the casino parking lot. Williamson's vehicle pulls in front of Harrigan's and both cars drive across the street to a gas station. For about two minutes,

the Bonneville is out of view of the cameras. Minutes later, the Bonneville returns and follows Harrigan's car in the direction of the highway.

¶ 28        On cross-examination, defense counsel extensively questioned Simmons regarding the events depicted in the surveillance video. Simmons acknowledged he watched the surveillance video "a few times."

¶ 29        Detective Donald Shepard testified on April 12, 2012, he was assigned to investigate an armed robbery at a parking garage at 512 Third Street. As part of the investigation, he interviewed Harrigan, Agarwal, and Ramelli. Later that same day, he and Detective Patrick Funkhouser returned to Harrigan's apartment to show him a photographic array. Harrigan identified defendant. He declined to initial next to his picture because he was only 85% certain. Harrigan told Detective Shepard "the facial features look just like the face. It looked just like the hair style, looked just like the facial hair style, but he just couldn't say for sure 100 percent because he couldn't see the body." The same photographic array was presented to Ramelli, but Ramelli did not identify defendant.

¶ 30        Detective Shepard further testified he interviewed defendant. The interview took place on the afternoon of April 19, 2012, in Champaign. Defendant denied any involvement with the robbery and stated he had never been to Champaign. Defendant initially denied knowing Williamson, but, when shown Williamson's photograph, defendant said he recognized the person as "J.K." The last time defendant saw Williamson was "about a week ago" at the Par-A-Dice casino. Defendant said he drove to the casino in a rental vehicle, and he was later joined by his sister and her boyfriend, but they left in the boyfriend's vehicle. Defendant could not recall where he rented the vehicle from because "[h]e had somebody rent the vehicle" and "he didn't

know who they were." Detective Shepard also asked defendant for his sister's contact information:

> "I asked what her phone number was. He said, oh, it's disconnected. It's out of service. And then he recited a number. He said that he didn't know where she lived. He doesn't know her birthday. I researched that through records in Peoria. He said she lived in Peoria, but he didn't know where. And I researched the records in Peoria with the police department for the utilities. If you live in Peoria and you have water or utility services, they have your records there. They had no record of the name of the woman that he gave me."

Detective Shepard was unable to find defendant's sister. Defendant also told Detective Shepard his girlfriend's name was Tanika Williams, but Detective Shepard found her and her name is Tanika Fullilove. During his testimony, Detective Shepard identified defendant in court, noting, "[h]e's seated at the defense table with the white shirt on and with the mustache."

¶ 31        Detective Robb Morris testified on April 12, 2012, he was assigned to investigate an armed robbery at 512 South Third Street. As part of the investigation, detectives requested information from gaming board agents at Par-A-Dice Casino. Agents from the casino provided video evidence of John Williamson and defendant at the casino, including "still shots of them and their ID's." The gaming board agents believed the suspects' vehicle was a "silver sedan, likely a Pontiac Bonneville."

¶ 32        On April 19, 2012, Detectives Morris and Funkhouser transported defendant from Peoria, where he was arrested, to Champaign. During the car ride, Detective Morris read

defendant his *Miranda* rights (*Miranda v. Arizona*, 384 U.S. 436 (1966)) and recorded an interview with him. Defendant initially denied knowing John Williamson, but when detectives showed him a photograph and referred to Williamson by his nickname, "J.K.," defendant admitted he knew him. Defendant said he last saw Williamson "about a week ago" at the Par-A-Dice casino. Defendant's sister and her boyfriend were also at the casino. Defendant said his sister and her boyfriend gave him a ride home in a blue Intrepid. He left the casino "close to 4 a.m." The State introduced the recorded interview into evidence and played it for the jury.

¶ 33    At defendant's April 20, 2012, arraignment, Tanika Fullilove (defendant's girlfriend) approached Detective Morris. Morris learned Fullilove drove to the courthouse in a silver Pontiac Bonneville, and he obtained a search warrant to search the vehicle. Defendant's cell phone was found inside the vehicle, but it was not the phone defendant had on the night of the robbery. Morris testified defendant obtained a new cell phone after the robbery but before his arrest one week later, and he transferred his old number to it. Morris testified Williamson drives a white Cadillac Deville.

¶ 34    As part of the investigation, Detective Morris obtained cell phone records from Williamson's U.S. Cellular account. Detective Morris testified there were five phone calls between defendant's phone and Williamson's phone between 11:48 p.m. and 12:04 a.m. No other calls were exchanged between the two that evening. Defendant's phone records show his phone was turned off or out of battery at 3:12 a.m.

¶ 35    The parties stipulated the phone records included raw data, which was used to pinpoint Williamson's cell phone location between April 11, 2012, and April 12, 2012. Satellite images of Williamson's phone show movement along Interstate 74 between Peoria and Champaign. Detective Morris testified it takes 1 1/2 hours to drive from Champaign to Peoria. At

5:21 a.m., Williamson's phone was near LeRoy, Illinois, when a call was placed to Leavell Allen. Williamson placed three more calls to Allen within the immediate vicinity of Champaign, at 5:48 a.m., 6:06 a.m., and 6:15 a.m. The armed robbery occurred just before 5:56 a.m. At 6:48 a.m., a call was made along Interstate 74 northwest of LeRoy. At 6:57 a.m., a call was placed around Bloomington, Illinois. Two more calls were made between Bloomington and Peoria at 7:08 a.m. and 7:16 a.m. At 7:33 a.m., defendant's girlfriend's phone called Williamson's phone near the river in Peoria. The State admitted into evidence 41 pages of satellite images from Google Earth, pinpointing Williamson's cell phone location, as well as 46 pages of raw data from U.S. Cellular, and published it to the jury. During his testimony, Detective Morris identified defendant in court, noting he is "[t]he young man in the white button down shirt behind the chair."

¶ 36        At the close of the State's evidence, defense counsel moved for a directed verdict, which the trial court denied. Defendant did not testify or present any evidence.


¶ 37                                B. Jury Instructions

¶ 38        The trial court instructed the jury on the definition of armed robbery as follows: "A person commits the offense of armed robbery when he, while carrying on or about his person or while otherwise armed with a dangerous weapon, knowingly takes property from the person or presence of another by the use of force or by threatening the imminent use of force." The trial court also read an instruction as to the elements of armed robbery. The trial court informed the jury the State had the burden to prove "the defendant or one for whose conduct he is legally responsible carried on—carried on or about his person a dangerous weapon or was otherwise

armed with a dangerous weapon at the time of the taking." The jury received these instructions in writing. Defendant did not object to the oral and written instructions given to the jury.

¶ 39    Following deliberations, the jury found defendant guilty of armed robbery. In January 2013, the trial court sentenced him to 30 years' imprisonment but did not impose any fines. The written sentencing order, dated January 18, 2013, and signed by Judge Difanis, required defendant to serve 30 years' imprisonment with credit for the 276 days served, and it ordered defendant to "pay costs of prosecution herein."

¶ 40    This appeal followed.


¶ 41                                II. ANALYSIS

¶ 42    On appeal, defendant argues the trial court committed plain error when it (1) violated the silent witness theory by allowing Simmons to narrate the events depicted on the surveillance video and (2) gave incorrect jury instructions, misdescribing an element of the offense. Assuming *arguendo* we find no plain error, defendant asserts trial counsel provided ineffective assistance for failing to object to Simmons's testimony and the jury instructions. Defendant further contends the State failed to prove him guilty of armed robbery beyond a reasonable doubt. Finally, he maintains fines imposed by the circuit clerk are void and he is entitled to $1380 in presentence credit.


¶ 43                                A. Plain Error

¶ 44    "The plain-error doctrine is a limited and narrow exception to the general rule of procedural default ***." *People v. Walker*, 232 Ill. 2d 113, 124, 902 N.E.2d 691, 697 (2009). "Under the plain-error doctrine, this court will review forfeited challenges when: (1) a clear or

obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant; or (2) a clear or obvious error occurred, and the error is so serious that it affected the fairness of the defendant's trial and the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Taylor*, 2011 IL 110067, ¶ 30, 956 N.E.2d 431. As a matter of convention, reviewing courts typically undertake plain-error analysis by first determining whether error occurred at all. *People v. Sargent*, 239 Ill. 2d 166, 189, 940 N.E.2d 1045, 1059 (2010). "If error is found, the court then proceeds to consider whether either of the [aforementioned] two prongs of the plain-error doctrine have been satisfied." *Id.* at 189-90, 940 N.E.2d at 1059. However, when a record clearly shows that plain error did not occur, we can reject that contention without further analysis. *People v. Bowens*, 407 Ill. App. 3d 1094, 1108, 943 N.E.2d 1249, 1264 (2011). We first address whether any error occurred at all.

¶ 45                                     1. *Silent Witness Theory*

¶ 46            Under the silent witness theory, a surveillance video may be admissible as substantive evidence in the absence of authentication by an eyewitness with personal knowledge of the content if there is adequate proof of the reliability of the process that produced the recording. *Taylor*, 2011 IL 110067, ¶ 35, 956 N.E.2d 431. Under this theory, it is not necessary for a witness to testify to the accuracy of the images depicted in the video so long as the accuracy of the process used to produce the evidence is established with an accurate foundation. *Id.* ¶ 32, 956 N.E.2d 431. This is so because the evidence is " 'received as a so-called silent witness or as a witness which "speaks for itself." ' " *Id.* (quoting Jordan S. Gruber, *Foundation for Contemporaneous Videotape Evidence*, *in* 16 Am. Jur. Proof of Facts 3d 493, § 5, at 508 (1992)).

¶ 47       In this case, defendant does not challenge the admissibility of the surveillance videos or the still photographs as substantive evidence. Rather, he contends he was denied a fair trial because the trial court permitted Simmons, who lacked personal knowledge, to narrate the events depicted in the surveillance videos. Defendant argues this testimony invaded the province of the jury and, therefore, requires a new trial.

¶ 48       We previously conducted a *de novo* review of whether it was proper for a witness to narrate the contents of a video without personal knowledge of the events portrayed in the video. See *People v. Sykes*, 2012 IL App (4th) 111110, ¶ 30, 972 N.E.2d 1272. After addressing the legal issue, we found, based on the circumstances presented, the trial court did not err in admitting Simmons's testimony. We are now charged with reconsidering our conclusions in light of the supreme court's decision in *Thompson*. *Mister*, No. 118934 (Ill. Mar. 30, 2016) (nonprecedential supervisory order).

¶ 49                                  a. Prior Legal Analysis

¶ 50       Effective January 1, 2011, Illinois adopted rules of evidence. Generally, a witness must testify only to facts based on personal knowledge. Ill. R. Evid. 602 (eff. Jan. 1, 2011). A witness may give opinion testimony if it is (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the testimony or determination of a fact in issue. Ill. R. Evid. 701 (eff. Jan. 1, 2011). Testimony otherwise admissible in the form of an opinion or inference is not objectionable simply because it embraces an ultimate issue the trier of fact must decide. Ill. R. Evid. 704 (eff. Jan. 1, 2011).

¶ 51       For instance, we have held a witness acquires personal knowledge where he or she observes an incident, at the time it occurred, through a live video feed. *People v. Tomei*, 2013

IL App (1st) 112632, ¶ 41, 986 N.E.2d 158. We explained a witness's testimony about what he or she observed on a live video feed is no different than if he or she "had been 100 yards away from defendant at the time of the incident but they needed a telescope to observe what was happening. As long as the telescope was functioning properly, we see no reason why they would not be able to testify as to what they observed." *People v. Tharpe-Williams*, 286 Ill. App. 3d 605, 611, 676 N.E.2d 717, 721 (1997).

¶ 52        Moreover, Illinois has long allowed identification testimony by witnesses who did not personally observe events depicted in a video recording. *People v. Starks*, 119 Ill. App. 3d 21, 25, 456 N.E.2d 262, 265 (1983). In establishing the standard for admission of such testimony, Illinois looked to the Federal Rules of Evidence and procedures adopted by other jurisdictions. *Id.*

¶ 53        In *Starks*, a case tried prior to Illinois's adoption of the rules of evidence, we found no error where the trial court admitted testimony from several correctional officers who identified defendants involved in a prison riot after viewing a videotape of the riot. *Id.* The officers were familiar with the defendants and had seen the defendants on many occasions prior to the riot. *Id.* at 26, 456 N.E.2d at 265. Additionally, the defendants were in the background of the video, making it difficult for the jurors to make the identification. Since the officers were familiar with the defendants' mannerisms and body movements, it was easier for them to identify the defendants than it was for the jurors. *Id.* at 26, 456 N.E.2d at 266. Relying on two decisions from California and one from Washington, we concluded identification testimony was an appropriate aid to the trier of fact in instances where the surveillance did not render a clear depiction. *Id.* at 25-26, 456 N.E.2d at 265 (citing *People v. Mixon*, 180 Cal. Rptr. 772 (Ct. App. 1982), *People v. Perry*, 131 Cal. Rptr. 629 (Ct. App. 1976), and *State v. Jamison*, 613 P.2d 776

(Wash. 1980)). Based on *Mixon*, *Perry*, and *Jamison*, we determined the officers' testimony "was rationally based upon the witnesses' personal knowledge of the defendants before the occurrence and their perception of what they saw in the videotapes." *Id.* at 26, 456 N.E.2d at 266. The officers' testimony helped the jury resolve the issue of identification and did not invade the province of the jury. *Id.*

¶ 54          Various panels of our appellate court have read *Starks* as establishing a two-part test: identification testimony of a lay witness who has no personal knowledge of the events depicted on a videotape is admissible where (1) the witness is familiar with the defendant prior to the offense and (2) the testimony aids the trier of fact in resolving the issue of identification and does not invade the jury's fact-finding duties. *People v. Thompson*, 2014 IL App (5th) 120079, ¶ 29, 21 N.E.3d 1 (citing *Starks*, 119 Ill. App. 3d at 25, 456 N.E.2d at 265, *Sykes*, 2012 IL App (4th) 111110, ¶ 35, 972 N.E.2d 1272, and *People v. Owens*, 394 Ill. App. 3d 147, 154, 914 N.E.2d 1280, 1286 (2009)). Appellate decisions have found two situations where testimony is helpful to the trier of fact: "The first type of situation is where a defendant's appearance has changed between the time of the recording and date of trial. The second category is where the video is an unclear or limited depiction." *Thompson*, 2014 IL App (5th) 120079, ¶ 29, 21 N.E.3d 1.

¶ 55          For example, in *Sykes*, 2012 IL App (4th) 111110, ¶ 37, 972 N.E.2d 1272, a case cited by defendant, we applied *Starks* to hold a loss-prevention manager's testimony violated the silent witness theory of admissibility. There, the manager lacked firsthand knowledge of the events depicted on the video because he reviewed surveillance footage after the theft occurred. Additionally, because the video was only three minutes in duration and defendant was the only person portrayed in the video, we found the manager was in no better position to determine

whether defendant removed money from the register, and, thus, his opinion testimony invaded the province of the jury. *Id.* ¶ 42, 972 N.E.2d 1272.

¶ 56　　　As noted above, Illinois adopted its own rules of evidence effective January 1, 2011. The Fifth District held "*Starks*' interpretation of the Federal Rules of Evidence is consistent with the subsequently enacted Illinois rules." *Thompson*, 2014 IL App (5th) 120079, ¶ 30, 21 N.E.3d 1. The Fifth District reiterated the rule in *Starks* as follows:

> "*Starks* would allow witnesses to identify a defendant from a recorded image if his appearance had changed or the image was unclear. *Starks* found that in such instances, the identifications were an aid to the jury. On the other hand, if the standards of *Starks* are not met, such an opinion would serve no utility and the province of the jury is invaded." *Id.* ¶ 40, 21 N.E.3d 1 (citing *Starks*, 119 Ill. App. 3d at 26, 456 N.E.2d at 266).

¶ 57　　　In our initial disposition, we found it significant the Fifth District reached its conclusion without looking to federal law for guidance, noting, while federal law is only persuasive authority, the language employed in Illinois Rules 701 and 704 is identical to Federal Rules 701 and 704(a). Moreover, we found *Thompson*'s narrow reading of *Starks*'s so-called "two-part" test goes beyond the precedential scope of the decision (see *People v. Flatt*, 82 Ill. 2d 250, 261, 412 N.E.2d 509, 515 (1980) ("It is well settled that the precedential scope of a decision is limited to the facts before the court."); in any case, we were not required to follow the decisions of sister districts or, for that matter, our own prior decisions. *O'Casek v. Children's Home & Aid Society of Illinois*, 229 Ill. 2d 421, 440, 892 N.E.2d 994, 1006-07 (2008). We further noted *Starks* relied on appellate decisions from California and Washington to support its

holding. We declined to follow the Fifth District's holding in *Thompson* because the analysis ignored how cases interpreting the federal rules of evidence changed during the past 30 years.

¶ 58          Because Illinois Rules of Evidence 701 and 704 (eff. Jan. 1, 2011) are identical to Federal Rules of Evidence 701 and 704(a) (eff. Dec. 1, 2011), we turned to federal jurisdictions for guidance.

¶ 59          A significant majority of jurisdictions that have addressed lay opinion testimony have held a lay witness may testify regarding the identity of a person depicted in a surveillance video if there is some basis for concluding the witness is more likely to correctly identify the defendant from the videotape than the jury. See, *e.g.*, *United States v. Jackman*, 48 F.3d 1 (1st Cir. 1995); *United States v. Henderson*, 68 F.3d 323 (9th Cir. 1995); *United States v. Stormer*, 938 F.2d 759 (7th Cir. 1991); *United States v. Allen*, 787 F.2d 933 (4th Cir. 1986), *judgment vacated on other grounds*, *Allen v. United* States, 479 U.S. 1077 (1987); *United States v. Farnsworth*, 729 F.2d 1158 (8th Cir. 1984); *United States v. Borrelli*, 621 F.2d 1092 (10th Cir. 1980); *United States v. Pierce*, 136 F.3d 770 (11th Cir. 1998). A small minority of jurisdictions have disfavored the admission of lay opinion testimony regarding the identity of a person depicted in surveillance video. *United States v. Calhoun*, 544 F.2d 291 (6th Cir. 1976); see also *United States v. Robinson*, 544 F.2d 110, 113 n.4 (2d Cir. 1976) (stating "it is not improper to exclude the testimony of lay witnesses asked to render an opinion whether the individual in a bank photograph is the defendant"). However, even the minority of jurisdictions have not adopted a *per se* rule excluding such lay opinion testimony.

¶ 60          Among the courts in the majority, a few have based the admission of lay opinion testimony on whether defendant's appearance in the videotape was different from his appearance at trial. *Farnsworth*, 729 F.2d at 1160; *Borrelli*, 621 F.2d at 1095. However, other courts have

explicitly rejected a change in the defendant's appearance as a requirement for admitting lay opinion testimony. *Stormer*, 938 F.2d at 761; *Allen*, 787 F.2d at 936. Those courts that do not require a change in the defendant's appearance have reasoned the evidentiary rule only requires lay opinion testimony be "helpful" to the jury, and such testimony is helpful even when the defendant's appearance has not changed. *Stormer*, 938 F.2d at 761; *Allen*, 787 F.2d at 936-37. These courts also note an unclear image may make a lay witness's opinion testimony particularly helpful in identifying the person in the surveillance videotape.

¶ 61        Various jurisdictions among the majority have further differed on the level of familiarity the witness must have with the defendant. In *United States v. Jackson*, 688 F.2d 1121, 1125 (7th Cir. 1982), the Seventh Circuit Court of Appeals held a lay witness's opinion as to the identity of the defendant in a surveillance photograph was proper even though the witness had only met the defendant once at a Christmas party. See also *United States v. Axselle*, 604 F.2d 1330, 1338 (10th Cir. 1979) (a single telephone call, combined with hearing a voice in court, is sufficient for voice identification testimony to go to the jury); *United States v. Zepeda-Lopez*, 478 F.3d 1213, 1220, 1222 (10th Cir. 2007) (Federal Bureau of Investigation agent's testimony was helpful to the jury where he looked at the video "many times" in forming his opinion that defendant was depicted in the video); *United States v. Kornegay*, 410 F.3d 89, 95 (1st Cir. 2005) (contact with the defendant six times within a few months was sufficient for the detective to identify defendant in surveillance pictures); *United States v. Beck*, 418 F.3d 1008, 1015 (9th Cir. 2005) (witness sufficiently familiar with defendant to offer identification testimony of defendant in surveillance video where he had met with him four times). In *Henderson*, 68 F.3d at 326, the Ninth Circuit Court of Appeals held: "Instead of any particular amount of sustained contact, we require a lay witness to have sufficient contact with the defendant to achieve a level of

familiarity that renders the lay opinion helpful." However, the Ninth Circuit excluded lay witness testimony in *United States v. LaPierre*, 998 F.2d 1460, 1465 (9th Cir. 1993), holding the lay witness did not have sufficient contact with the defendant where the witness had never seen the defendant in person and was familiar with his appearance only through other photographs and witness's descriptions.

¶ 62 In general, "courts have been liberal in determining the extent of perception required to satisfy the first requirement of Rule 701." *United States v. Bush*, 405 F.3d 909, 916 (10th Cir. 2005). All courts among the majority agree a lay witness who has sufficient familiarity with the defendant may properly testify as to the identity of the defendant in a surveillance videotape. Moreover, several jurisdictions agree that whether a lay witness's prior contacts with the defendant are extensive enough to permit a proper identification is a matter of weight for the jury, not admissibility. *United States v. Wright*, 904 F.2d 403, 405 (8th Cir. 1990); *Allen*, 787 F.2d at 936; *Jackson*, 688 F.2d at 1125.

¶ 63 In *United States v. Begay*, 42 F.3d 486, 502 (9th Cir. 1994), a case cited by the State, an officer provided narrative testimony regarding a video of a demonstration involving approximately 200 demonstrators that resulted in violence. The officer reviewed the video more than 100 times, copied portions of the video in slow motion, magnified and enhanced its quality to help identify the individuals depicted, and assessed more than 800 photographs taken during the incident. He then added circles and arrows to help the jury follow the defendants' movements. *Id.* Although the officer was not present when the actual events took place, his testimony consisted of narrating portions of the video. The defendant appealed, arguing the officer's testimony was not admissible under Rule 701 because his testimony was not based on his own perceptions. The United States Court of Appeals for the Ninth Circuit disagreed. The

court held the officer's perceptions did not need to be based on the "live" events of the crime because he was not providing an eyewitness account. *Id*. Rather, the officer was testifying only with respect to the scenes depicted in the videotape; therefore, he needed only to have perceived the video. *Id*. Thus, the Ninth Circuit rejected the defendant's argument that the officer's testimony was cumulative and invaded the province of the jury. The court further reasoned the officer's testimony likely helped the jury evaluate the video. The court explained:

> "Moreover, we agree with the District Court that [the officer's] testimony *** was likely to have been helpful to the jury in evaluating [the videotape]. Although the jury viewed [the videotape] in its entirety, it is reasonable to assume that one viewing a videotape of a demonstration involving over 200 people would likely not see certain details, given the tremendous array of events all occurring simultaneously. [The officer] spent over 100 hours viewing [the videotape]. To have the jury do likewise would be an extremely inefficient use of the jury's and the court's time. Therefore, [the officer's] testimony concerning which persons were engaged in what conduct at any given moment could help the jury discern correctly and efficiently the events depicted in the videotape." *Id*. at 503.

¶ 64    Similarly, courts have departed from the rule requiring the witness to have "previously acquired familiarity" or "personal knowledge" of the defendant's appearance before or at the time of the event.

¶ 65          In *People v. Larkins*, 131 Cal. Rptr. 3d 911, 917-18 (Ct. App. 2011), the California Appellate Court distinguished *Mixon* and *Perry*—cases we relied on in *Starks*—to hold a loss-prevention manager's testimony was admissible where he observed defendant in surveillance recordings. There, a loss-prevention manager testified the defendant, who was not a member of the chain of gyms, was the person depicted in the surveillance video. The manager said he was able to recognize the defendant because he had seen him in 20 to 30 surveillance videos. The appellate court rejected the defendant's contention the manager's testimony was inadmissible under *Mixon* and *Perry* because he had no "previously acquired familiarity" or "personal knowledge" of the defendant's appearance. The court reasoned:

> "It is thus clear that *Perry*'s, and, therefore, *Mixon*'s insistence on the lay witness being familiar with the defendant prior to or at the time the picture was taken (which was during the crime) is because in each case, the defendant had altered his appearance between the crime and trial. No such alteration occurred here. *** The second thing to remember about *Perry* and *Mixon* is that they involved still photos. It is one thing to see a single photo of a person and attempt to identify that person based on it. But, here, the manager saw 20 to 30 videos of defendant, during which time he could observe such distinguishing characteristics as defendant's posture, gait and body movements. Thus, whatever the holdings of *Perry* and *Mixon*, they are logically inapplicable to videos. Finally, *Perry* and *Mixon* correctly point out that the degree of knowledge of the subject by the identifier is

a matter of weight, not admissibility. At some point, which the record does not disclose, the manager saw defendant's driver's license and his booking photo and, therefore knew the name of the person he was seeing in the videos." *Id.*

The court concluded, "[i]t does not matter at what point in his viewing of the videos—either before, during or after—that he saw what were indisputably photos of the defendant, and then could put a name to the images he saw." *Id*. at 918. The court further reasoned:

"The manager looking at two photographs of defendant is no different than the police officers in *Perry* and *Mixon* seeing the defendant during prior contacts with them. One can be sufficiently familiar with a person by seeing photos of him to later identify him in the same or another medium. We do not doubt that a starstruck young lady who has seen pictures of Justin Bieber in magazines could easily identify him were she to see him on a video, on television or in person." *Id.*

The court in *Larkins* therefore held the manager " 'acquir[ed] knowledge "through one's senses" by personal observation,' " as required by *Mixon* and *Perry*. *Id.*

¶ 66        Indeed, other states have allowed witnesses to testify concerning information they viewed on videotape. See, *e.g.*, *Vinson v. State*, 735 N.E.2d 828, 835 (Ind. Ct. App. 2000) (trial court properly allowed the police officer to testify with regard to his opinion that Vinson was the person depicted in the surveillance video, where the officer had the opportunity to view the video 15 to 20 times), *disapproved of on other grounds in Long v. State*, 743 N.E.2d 253 (Ind. 2001); *Domingo v. Boeing Employees' Credit Union*, 98 P.3d 1222, 1226 (Wash. Ct. App. 2004)

(witness's statements as to what the videotapes contained were based on personal knowledge where witness had viewed the videotapes herself but was not physically present at the events depicted in the videotape); *People v. Fomby*, 831 N.W.2d 887, 890 (Mich. Ct. App. 2013); *Robinson v. People*, 927 P.2d 381, 384 (Colo. 1996); *Moreland v. State*, 53 A.3d 449, 455 (Md. Ct. Spec. App. 2012); *People v. Hardy*, 981 N.Y.S.2d 722 (App. Div. 2014); *State v. Ely*, 690 N.W.2d 698 (Iowa Ct. App. 2004) (table); *State v. Hardy*, 884 P.2d 8 (Wash. Ct. App. 1994); *Nooner v. State*, 907 S.W.2d 677 (Ark. 1995); *State v. Morrill*, 681 A.2d 369 (Conn. App. Ct. 1996).

¶ 67        Following our review, we adopted the majority view and held (1) a lay witness may testify regarding the identity of a person depicted in a surveillance video if there is some basis for concluding the witness is more likely to correctly identify the individual from the videotape than is the jury; (2) the lay witness's familiarity with the person goes to the weight to be given to the witness's testimony, not the admissibility of such testimony; and (3) the person's appearance need not have changed from the time of the videotape to the time of trial, so long as the lay opinion testimony is helpful to the jury. Thus, we held, although the witness must be in a better position than the jurors to identify the individuals captured by the camera, this does not require the witness to have prior knowledge of those individuals; nor does it require those individuals to have changed their appearance. In accordance with the supreme court's directive, we turn to *Thompson* to determine if these legal findings were in error. *Mister*, No. 118934 (Ill. Mar. 30, 2016) (supervisory order).

- 31 -

¶ 68                                    b. *Thompson*

¶ 69          In *Thompson*, 2016 IL 118667, 49 N.E.3d 393, the supreme court addressed the admissibility of lay opinion identification testimony under Illinois Rule of Evidence 701 (eff. Jan. 1, 2011). As Rule 701 was modeled after its federal counterpart (Fed. R. Evid. 701), the court looked to federal law, as well as state decisions interpreting similar rules for guidance. *Thompson*, 2016 IL 118667, ¶¶ 40-49, 49 N.E.3d 393.

¶ 70          The supreme court declined to adhere to the two-part test of *Starks* that the appellate court relied upon, finding it to be at odds with the great weight of authority. *Id.* ¶ 52. Specifically, the court (1) found a witness need not have familiarity with the defendant before or at the time of the recording to testify and (2) rejected *Starks* to the extent it limited identification testimony solely to those instances where either the defendant's appearance had changed between the time of the recording and trial or where the recording lacked clarity to render such testimony admissible. *Id.*

¶ 71          The supreme court held lay opinion identification testimony is admissible where "(a) the testimony is rationally based on the perception of the witness and (b) the testimony is helpful to a clear understanding of the witness's testimony or a determination of a fact in issue." *Id.* ¶ 50. As it related to an identification from a surveillance recording, the court found such testimony helpful where "there is some basis for concluding the witness is more likely to correctly identify the defendant from the surveillance recording than the jury." *Id.*

¶ 72          To determine whether a basis exists by which a witness is more likely to correctly identify the defendant, the court found: "A showing of sustained contact, intimate familiarity, or special knowledge of the defendant is not required. Rather, the witness must only have had contact with the defendant, that the jury would not possess, to achieve a level of familiarity that

renders the opinion helpful." *Id.* The court adopted a totality of the circumstances approach that considers the following factors:

> "the witness's general familiarity with the defendant; the witness['s] familiarity with the defendant at the time the recording was made or where the witness observed the defendant dressed in a manner similar to the individual depicted in the recording; whether the defendant was disguised in the recording or changed his/her appearance between the time of the recording and trial; and the clarity of the recording and extent to which the individual is depicted." *Id.* ¶ 51.

The court noted "the absence of any particular factor does not render the testimony inadmissible." *Id.* In addition, the court found "the extent of a witness's opportunity to observe the defendant goes to the weight of the testimony, not its admissibility." *Id.* ¶ 53. Finally, even if admissible, the court noted lay opinion identification testimony may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. *Id.* ¶ 54 (quoting Illinois Rule of Evidence 403 (eff. Jan. 1, 2011)).

¶ 73        The supreme court concluded: "If such testimony is admitted under the above standards, it would not invade the province of the jury because the jury is free to reject or disregard such testimony and reach its own conclusion regarding who is depicted in the surveillance recording." *Id*. The court further indicated a trial court's decision to admit lay opinion identification testimony should be reviewed for an abuse of discretion. *Id.* ¶ 53.

¶ 74        After review, we conclude our previous legal findings are consistent with those of *Thompson*. With the additional guidance of *Thompson*, we turn to the specific facts of the case

presented to determine whether a different result is warranted. We review the trial court's decision to admit Simmons's lay opinion testimony for an abuse of discretion.

¶ 75                           c. Simmons's Lay Opinion Testimony

¶ 76        We find Simmons's testimony was rationally based on his perception of the video. We recognize Simmons was not present and did not observe anything at the casino while the events took place, but we find, when analyzing the perception of the witness under Illinois Rule of Evidence 701 (eff. Jan. 1, 2011), the focus is properly placed on Simmons's perception of the video. See *People v. Gharrett*, 2016 IL App (4th) 140315, ¶¶ 72-73, 53 N.E.3d 332. Just like *Begay* and *Larkins*, Simmons watched surveillance footage from numerous cameras placed throughout the casino's property to track defendant's movement during the entire five-hour period he was at the casino. He produced short clips and isolated certain frames to create still images—including color photographs of defendant and defendant's driver's license. On the basis of his close scrutiny of the surveillance footage and the 135 pages of still photographs he created, Simmons's opinions were ultimately derived from his repeated viewings of the video, which he highly scrutinized. Simmons had the benefit of reviewing the video numerous times, giving him the opportunity to comprehend the events transpiring on the video and to determine the identity of the participants.

¶ 77        We also find Simmons's testimony helpful to the trier of fact. His testimony linked individuals depicted in the surveillance video as being the same individuals depicted in the still photographs. Here, the ultimate issue was whether defendant carried out the armed robbery in Champaign. The purpose of Simmons's testimony was to determine whether the black suspect left the casino in the same car as the white suspect, which followed the victim's car

toward Interstate 74. Although Simmons referred to the suspects by name (as stated on their state ID cards), he did not testify any of the individuals depicted in either the still photographs or surveillance video was defendant. See, *e.g.*, *Larkins*, 131 Cal. Rptr. 3d at 917-18. His opinions were intended to provide a clearer understanding about whether defendant and Williamson were at the casino, left the casino in same vehicle, and followed Harrigan home. Just like *Begay*, the video contains nearly four hours of footage, lacks clarity, is difficult to assess, and involves fluid scenes and numerous individuals and vehicles. One would likely miss certain details considering the wide array of events captured by surveillance cameras located throughout the casino and parking lots. Simmons acknowledged he had to view the videotape a "few times" before indentifying a black male as a possible suspect. To have the jury do likewise would be an extremely inefficient use of the jury's and the court's time. As a result, Simmons's testimony was helpful to the jury.

¶ 78        Finally, the weight to be given to Simmons's lay opinion testimony is for the trier of fact to assess. This rule assumes the adversarial system will generally lead to an acceptable result, because any inadequacies in the admitted testimony can be highlighted through cross-examination. *Bush*, 405 F.3d at 916 (citing Fed. R. Evid. 701, Advisory Committee Notes on Proposed Rules). Here, defendant's counsel extensively cross-examined Simmons and had the opportunity to highlight any deficiencies in his testimony regarding his familiarity with defendant or the clarity of the videotape. Because the jury had the benefit of any cross-examination testimony in determining the weight to place on Simmons's identification, the province of the jury was not compromised.

¶ 79        Because Simmons's testimony was (1) rationally based his own perception of the video and (2) helpful for the jury to determine whether the two individuals played craps at Par-

A-Dice casino earlier in the evening, Simmons's testimony was admissible under Illinois Rule of Evidence 701 (eff. Jan. 1, 2011). Defendant has further failed to demonstrate the testimony was overly prejudicial. Since we find the trial court did not err by allowing Simmons to narrate the surveillance video, we need not proceed further through the plain-error analysis.

¶ 80                                    2. *Jury Instructions*

¶ 81           Defendant next asserts we must reverse his conviction of armed robbery because the jury was not correctly instructed as to the elements of the offense. The State charged defendant with armed robbery while armed with a *firearm*. At the jury instruction conference, the State tendered various instructions, without objection, to the trial court. In turn, the trial court instructed the jury defendant allegedly committed the offense while armed with a *dangerous weapon*. According to defendant, since the jury was never instructed being armed with a firearm was an element of the offense, it did not find defendant guilty of every element of the offense. Alternatively, defendant argues the armed robbery statute under which he was indicted explicitly excludes a firearm as a dangerous weapon and thus the jury found him guilty of a nonexistent offense, which renders his conviction void.

¶ 82           Defendant concedes he forfeited the issue because he neither objected to the jury instructions offered by the State nor raised the issue in a posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186, 522 N.E.2d 1124, 1129 (1988). Defendant argues we may address his argument under the plain-error doctrine. We therefore turn to the first step of plain-error review and determine whether an error occurred.

¶ 83           Jury instructions are intended to guide the jury and assist in its deliberations and in reaching a proper verdict. *People v. Parker*, 223 Ill. 2d 494, 501, 861 N.E.2d 936, 939 (2006).

"The task of a reviewing court is to determine whether the instructions, considered together, fully and fairly announce the law applicable to the theories of the State and the defense." *People v. Mohr*, 228 Ill. 2d 53, 65, 885 N.E.2d 1019, 1026 (2008). We review *de novo* whether jury instructions accurately convey the law. *People v. Watt*, 2013 IL App (2d) 120183, ¶ 30, 1 N.E.3d 1145 (citing *Parker*, 223 Ill. 2d at 501, 861 N.E.2d at 939).

¶ 84    Here, defendant was charged with committing armed robbery while carrying a "firearm," but the definitional instruction given to the jury discussed being armed with a "dangerous weapon." See Illinois Pattern Jury Instructions, Criminal, No. 14.05 (4th ed. 2000) (hereinafter, IPI Criminal 4th No. 14.05) (noting that a "person commits the offense of armed robbery when he, while carrying on or about his person, or while otherwise armed with a dangerous weapon" takes property with force or threat of force). Similarly, the instruction listing the elements for armed robbery mentioned a dangerous weapon, rather than a firearm. See Illinois Pattern Jury Instructions, Criminal, No. 14.06 (4th ed. 2000) (hereinafter, IPI Criminal 4th No. 14.06) ("To sustain the charge of armed robbery, the State must prove *** [t]hat the defendant *** carried on or about his person a dangerous weapon ***.").

¶ 85    These instructions do not accurately state the law. The armed robbery statute was amended effective January 1, 2000, and the amendment created substantively distinct offenses based on whether the offense was committed with a "firearm" or a dangerous weapon "other than a firearm." (Internal quotation marks omitted.) *People v. Washington*, 2012 IL 107993, ¶ 6, 969 N.E.2d 349; compare 720 ILCS 5/18-2(a)(2) (West 2010) with 720 ILCS 5/18-2(a)(1) (West 2010). By referring to a "dangerous weapon," the jury instructions did not reflect the substantive change in the law. We hold it was error for the trial court to give jury instruction No. 14.05 (IPI Criminal 4th No. 14.05) and jury instruction No. 14.06 (IPI Criminal 4th No. 14.06). See *Watt*,

2013 IL App (2d) 120183, ¶ 39, 1 N.E.3d 1145; *People v. Ware*, 2014 IL App (1st) 120485, ¶ 18, 7 N.E.3d 796 (reaching the same result).

¶ 86 Having found the jury instruction incorrectly referenced a "dangerous weapon," we must now determine whether this error rises to the level of plain error. Defendant argues the error in the jury instructions is serious enough it satisfies the plain-error analysis under the second prong. We disagree.

¶ 87 Our supreme court held a jury-instruction error rises to the level of plain error only when it "creates a serious risk that the jurors incorrectly convicted the defendant because they did not understand the applicable law, so as to severely threaten the fairness of the trial." *People v. Hopp*, 209 Ill. 2d 1, 8, 805 N.E.2d 1190, 1194 (2004). Illinois courts have narrowed the second prong to structural errors, "*i.e.*, 'a systemic error which serves to "erode the integrity of the judicial process and undermine the fairness of the defendant's trial." ' " *Watt*, 2013 IL App (2d) 120183, ¶ 38, 1 N.E.3d 1145 (quoting *People v. Glasper*, 234 Ill. 2d 173, 197-98, 917 N.E.2d 401, 416 (2009), quoting *People v. Herron*, 215 Ill. 2d 167, 186, 830 N.E.2d 467, 479 (2005)).

¶ 88 In *Watt*, 2013 IL App (2d) 120183, ¶ 39, 1 N.E.3d 1145, the court held any error in the jury instructions regarding a "dangerous weapon" rather than a "firearm" did not rise to the level of plain error. The court explained, "when the instructions referred to a 'dangerous weapon' rather than a 'firearm,' they misdescribed an element" and "a firearm is still a class of dangerous weapon." *Id.* The court held:

> "Because an error in an instruction that either omits an element or
>
> misdescribes an element is not a structural error [citation],
>
> automatic reversal is not required. Moreover, the jury's verdict of

guilty of armed robbery in the present case was based on evidence that defendant was armed with a firearm. It follows that, in finding that defendant was armed with a 'dangerous weapon,' the jury implicitly found that defendant was armed with a firearm. The error did not create a serious risk that the jurors incorrectly convicted defendant because they did not understand the applicable law, so as to severely threaten the fairness of the trial. [Citation.]"

*Id.*

See also *Ware*, 2014 IL App (1st) 120485, ¶ 21, 7 N.E.3d 796 (jury instruction referring to a "dangerous weapon" did not affect the jury's understanding of the applicable law or the offense committed).

¶ 89        Similarly, here, despite the fact the jury instructions were based on an earlier version of the armed robbery statute and thus misstated the law, such an error does not fall within the class of structural errors that rise to the level of plain error. The error did not create a serious risk that the jurors incorrectly convicted defendant because they did not understand the applicable law, so as to severely threaten the fairness of the trial. Indeed, " 'Illinois case law indicates that a gun is a dangerous weapon per se ***.' " *People v. Ross*, 229 Ill. 2d 255, 273, 891 N.E.2d 865, 877 (2008) (quoting *People v. Greer*, 53 Ill. App. 3d 675, 681, 368 N.E.2d 996, 1001 (1977)). Therefore, like the courts in *Watt* and *Ware*, we conclude the jury was fully advised on the relevant legal principles, and defendant cannot prevail under a plain-error analysis.

¶ 90        Defendant asserts his due process rights were violated because the armed robbery statute explicitly excludes a firearm as a dangerous weapon, so the jury found him guilty of a

nonexistent offense. We decline defendant's invitation to adopt Chief Justice Kilbride's dissent in *Washington*, 2012 IL 107993, ¶ 54, 969 N.E.2d 349 (Kilbride, C.J., dissenting, joined by Theis, J.), where he reasoned a firearm is not included in the category of dangerous weapons. The legislature simply distinguished firearms from other types of dangerous weapons by using the language "dangerous weapon other than a firearm." The legislature could have expressly excluded firearms from the genus of dangerous weapons but did not do so. Because the jury found defendant was armed with a "dangerous weapon," it implicitly found he was armed with a firearm. Consequently, defendant's reasonable-doubt argument fails. *Watt*, 2013 IL App (2d) 120183, ¶ 39 n.3, 1 N.E.3d 1145.

¶ 91                          B. Ineffective Assistance of Counsel

¶ 92          Defendant's ineffective-assistance argument remains. To show ineffective assistance of counsel, a defendant must show (1) defense counsel's performance was so deficient it "fell below an objective standard of reasonableness" and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984).

¶ 93                          1. *Silent Witness Theory*

¶ 94          Defendant asserts his trial counsel's failure to object to Simmons's lay opinion testimony constitutes ineffective assistance of counsel. The decision to object to the admission of evidence is a strategic one and generally may not form the basis of a claim of ineffective assistance of counsel. *People v. Perry*, 224 Ill. 2d 312, 344, 864 N.E.2d 196, 216 (2007). More importantly, "counsel cannot be ineffective for failing to object if there was no error to object

to." *People v. Sanders*, 2012 IL App (1st) 102040, ¶ 24, 965 N.E.2d 1275; *cf. People v. McGhee*, 2012 IL App (1st) 093404, ¶¶ 45-50, 964 N.E.2d 715.

¶ 95       As discussed above, the trial court did not err when it allowed Simmons to narrate the events depicted on the surveillance video. Any objection to his testimony on the grounds it violated the silent witness theory would be futile. "Defense counsel is not required to make futile motions or objections in order to provide effective assistance." (Internal quotation marks omitted.) *People v. Smith*, 2014 IL App (1st) 103436, ¶ 64, 16 N.E.3d 129. By objecting to Simmons's testimony, defense counsel would run the risk of appearing obstructionist to the jury, especially here, where the surveillance video was going to be admitted. Defense counsel was not objectively unreasonable for refraining to object to Simmons's testimony. Moreover, defense counsel thoroughly cross-examined Simmons regarding the video's lack of clarity and challenged his observations. In an attempt to establish his defense that he never went to Champaign with Williamson, he relied in part on some narration of the video by Simmons, and defense counsel himself made observations concerning the video, which he claimed supported defendant's case. Throughout his closing argument, defense counsel repeatedly referenced Simmons's testimony to support his argument someone else committed the armed robbery.

¶ 96                                 2. *Jury Instructions*

¶ 97       Next, defendant maintains relief is warranted because trial counsel provided ineffective assistance when he failed to object to the jury instructions. It is well settled in Illinois that counsel's choice of jury instructions, and the decision to rely on one theory of defense to the exclusion of others, is a matter of trial strategy. *People v. Douglas*, 362 Ill. App. 3d 65, 75, 839 N.E.2d 1039, 1048 (2005). Accordingly, counsel's decision as to which jury instruction to tender

can support a claim of ineffective assistance of counsel only if that choice is objectively unreasonable. *Id*. When the evidence against a defendant is overwhelming, the lack of a particular jury instruction is harmless in light of the other instructions, arguments of counsel, and a generally fair trial. *People v. Barker*, 298 Ill. App. 3d 751, 764-65, 699 N.E.2d 1039, 1048 (1998).

¶ 98       Here, overwhelming evidence a firearm was used during the commission of the offense was presented at trial. Harrigan and Agarwal both testified defendant brandished a short-barreled, silver or chrome revolver. Defense counsel did not dispute an armed robbery occurred. Indeed, during closing arguments, defense counsel stated: "obviously we're not here to argue about whether or not an armed robbery took place, that much is not in dispute." Instead, defense counsel attacked the State's evidence regarding the identification of defendant as a perpetrator of the crime. Given the overwhelming evidence an armed robbery occurred, we find the failure to tender a jury instruction on whether defendant was armed with a firearm as opposed to a dangerous weapon, a fact not in dispute, did not prejudice defendant in any way. In our opinion, tendering such an instruction would not have changed the outcome of this trial, and defendant cannot satisfy the second prong of the *Strickland* test.


¶ 99                          C. Sufficiency of the Evidence

¶ 100       Defendant asserts the State failed to produce sufficient evidence to sustain his conviction for armed robbery. Specifically, defendant argues (1) no evidence showed defendant was in the car with Williamson, (2) the evidence supports defendant's theory someone else committed the robbery, and (3) no eyewitness identified defendant as the offender. The State responds the evidence is sufficient to sustain his conviction.

¶ 101     Considering the evidence in the light most favorable to the State, we must determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Ross*, 229 Ill. 2d at 272, 891 N.E.2d at 876. We will not substitute our judgment for that of the jury with regard to the credibility of witnesses, the weight to be given to each witness's testimony, or the reasonable inferences to be drawn from the evidence. *Id.* "A criminal conviction will not be set aside unless the evidence is so improbable or unsatisfactory as to create a reasonable doubt of the defendant's guilt." *People v. Siguenza-Brito*, 235 Ill. 2d 213, 225, 920 N.E.2d 233, 240-41 (2009).

¶ 102     Armed robbery occurs when a defendant knowingly takes property from the person or presence of another by use of force or by threatening the imminent use of force, and, in doing so, carries on or about his or her person or is otherwise armed with a firearm. 720 ILCS 5/18-2(a)(2) (West 2010).

¶ 103     On appeal, defendant does not appear to question the commission of these crimes, but he challenges the sufficiency of the evidence to establish he was the perpetrator. When viewed in the light most favorable to the State (*Siguenza-Brito*, 235 Ill. 2d at 224, 920 N.E.2d at 240), we find the evidence was sufficient to prove the elements of the offenses beyond a reasonable doubt. The evidence shows the perpetrator pointed a silver revolver at Harrigan while he was sitting in his car and took his cell phone, $2500, driver's license, and casino card from his person.

¶ 104     Proof of an offense, however, requires proof not only the crime occurred, but also that it was committed by the person charged. *People v. Slim*, 127 Ill. 2d 302, 307, 537 N.E.2d 317, 319 (1989) (the State bears the burden of proving beyond a reasonable doubt the identity of the person who committed a crime). The testimony of a single witness, if it is positive and the

witness credible, is sufficient to convict a defendant. *People v. Smith*, 185 Ill. 2d 532, 541, 708 N.E.2d 365, 369 (1999). In assessing the reliability of a witness identification, the well-established factors to consider are (1) the witness's opportunity to view the defendant during the offense, (2) the witness's degree of attention at the time of the offense, (3) the accuracy of the witness's prior description of the defendant, (4) the witness's level of certainty at the subsequent identification, and (5) the length of time between the crime and the identification. *Slim*, 127 Ill. 2d at 307-08, 537 N.E.2d at 319 (citing *Neil v. Biggers*, 409 U.S. 188 (1972)). "The conditions need not be perfect and the observation need not be prolonged." *People v. Benson*, 266 Ill. App. 3d 994, 1005, 641 N.E.2d 617, 626 (1994).

¶ 105        Defendant argues neither Harrigan nor Agarwal identified him in a photographic lineup, and thus no "positive and credible" identification was made. We disagree. With respect to the first *Slim-Biggers* factor, Harrigan had a good opportunity to view defendant at the time of the crime, as defendant approached the vehicle and stood a short distance away, directly in front of them. Defendant's hood was down, and he was not wearing anything to cover his face.

¶ 106        As to the second factor, Harrigan's degree of attention was high, as he testified that his attention was directed to defendant when he quickly approached him, pointed a gun in his face, and demanded "the bread." Harrigan's high degree of attention also was demonstrated by his detailed recollection of what defendant did from the moment he approached Harrigan's vehicle until he brandished the gun, took his money, and fled.

¶ 107        Regarding the third factor, Harrigan provided accurate descriptions to police detectives. He described defendant as an African-American male in his early twenties who was 5 feet, 10 inches tall and 180 pounds. Harrigan said defendant was wearing a dark sweater with no hood and dark jeans. Harrigan described defendant's hair as short and braided around the side

and back of his head. Defendant had a light mustache and trim facial hair, which "scooped the whole chin up to the ear."

¶ 108    With respect to the fourth factor, the level of certainty in the identification, Detective Shepard testified when he showed Harrigan the photographic array containing defendant's photograph, he correctly identified him as the offender. Detective Shepard also testified Harrigan said he was 80% to 85% certain.

¶ 109    Regarding the fifth factor, the length of time between the crime and Harrigan's identification of defendant was a few hours. The armed robbery occurred around 6 a.m., and Detective Shepard testified he returned to Harrigan's apartment in the afternoon to present the photographic array. Thus, the period of time is relatively short. See, *e.g.*, *People v. Rodgers*, 53 Ill. 2d 207, 213-14, 290 N.E.2d 251, 255 (1972) (identification upheld where it was made two years later).

¶ 110    In sum, weighing all of the *Slim-Biggers* factors and viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found Harrigan viewed defendant under circumstances permitting a positive identification despite the fact he did not identify him in the courtroom. Notably, the jury was shown still photographs taken from the casino's surveillance cameras, which clearly recorded defendant's picture and state ID card. The jury was thus able to compare Harrigan's and Agarwal's descriptions of defendant with defendant's appearance in the surveillance videos. *People v. Span*, 2011 IL App (1st) 083037, ¶¶ 24-28, 955 N.E.2d 100 (a reviewing court should not substitute its judgment for that of the jury when findings of fact regarding identity are made, in part, from surveillance footage). To the extent Harrigan described defendant as "five ten" and Agarwal described him as "five eight," such discrepancies do not, in and of themselves, generate a reasonable doubt as long as a positive

identification has been made. *Slim*, 127 Ill. 2d at 309, 537 N.E.2d at 320 (Any discrepancies and omissions as to facial and other physical characteristics are not fatal but merely affect the weight to be given the identification testimony.). As discussed, any rational trier of fact could have found Harrigan's identification testimony supported by the surveillance video and still photographs taken of defendant hours before the armed robbery occurred.

¶ 111        We further note, a conviction can be sustained upon circumstantial evidence, and the jury is not required to disregard inferences that flow normally from the evidence before it. *People v. Patterson*, 217 Ill. 2d 407, 435, 841 N.E.2d 889, 905 (2005).

¶ 112        In this case, the evidence shows defendant and Williamson were at Par-A-Dice Casino on April 12, 2012, and they played craps at the same table as Harrigan. Although defendant and Williamson stopped gambling at 1:50 a.m., the surveillance videos show they remained at the casino, evidently waiting for Harrigan to leave. Surveillance videos show defendant and Williamson enter and exit the same vehicle, a silver Bonneville, throughout the night. At 4:03 a.m., defendant entered the passenger side door and remained in the vehicle. At 4:30 a.m., Williamson followed Harrigan out of the casino, entered the driver's side door of the silver Bonneville, and followed Harrigan across the street to a gas station and then toward Interstate 74. In addition, the phone call from defendant's girlfriend's phone to Williamson's phone at 7:33 a.m. lends credence to his being with Williamson at that time—*i.e.*, since she could not reach defendant on his phone, which was off, she tried contacting him through Williamson, whom she knows he was with. Also, Detective Morris testified defendant's girlfriend drove a silver Bonneville to defendant's arraignment and defendant's cell phone was found inside the vehicle. Thus, the jury could reasonably conclude the silver Bonneville was used by defendant and he was inside this vehicle with Williamson.

¶ 113　　　　　Moreover, a critical aspect of the State's theory was defendant and Williamson left the casino in the same car around 4:35 a.m. and defendant committed the armed robbery just before 5:56 a.m. Thus, defendant's whereabouts during this period were a critical aspect of the State's case. However, defendant never gave a consistent explanation on this point. In his first statement to the police, around noon on April 19, 2012, he said his sister gave him a ride home in a blue Intrepid. But in his interview later that afternoon, defendant stated he left the casino in a rental car and did not know the make, model, where it was rented, or who rented it for him. Defendant also lied about his girlfriend's last name and provided false or misleading information about his sister. In both his noon and afternoon interviews, defendant told the detectives he did not know Williamson, but he recanted that statement both times when shown Williamson's picture. These deviations deal with defendant's alibi, and "a false alibi can be a factor in establishing guilt beyond a reasonable doubt." *People v. Milka*, 211 Ill. 2d 150, 182, 810 N.E.2d 33, 51 (2004). Moreover, defendant's lies are evidence of his consciousness of guilt. See *id*. at 181, 810 N.E.2d at 51 (false exculpatory statements are probative of a defendant's consciousness of guilt).

¶ 114　　　　　Finally, defendant argues Leavell Allen committed the armed robbery because he was in Champaign and Williamson placed several phone calls to him around the time of the robbery. However, this argument was presented to and rejected by the jury. Additionally, mere possibilities or speculation are insufficient to raise a reasonable doubt of guilt (*People v. Phillips*, 215 Ill. 2d 554, 574, 831 N.E.2d 574, 586 (2005)), and it is not our function to speculate why Williamson called Allen or to what the substance of their conversation pertained. The jury was not obliged to accept any proffered explanation compatible with defendant's innocence. *People v. Evans*, 209 Ill. 2d 194, 212, 808 N.E.2d 939, 949 (2004).

¶ 115 In sum, viewing the evidence presented in the light most favorable to the State (*Siguenza-Brito*, 235 Ill. 2d at 224, 920 N.E.2d at 240), we conclude the State presented sufficient evidence to allow the jury to find defendant was the person who pointed a gun at Harrigan as he sat in his car and threatened to start shooting, then took his cell phone, money clip, and contents thereof, and the jury properly found him guilty of armed robbery.

¶ 116 D. Fines

¶ 117 Finally, we now turn to defendant's claim the circuit clerk improperly imposed fines—specifically, a $50 court finance fine; $5 drug court fine, $10 State Police operations fine; $30 juvenile expungement fine; $10 arrestee's medical fine; $12 and $100 Violent Crime Victims Assistance Act (725 ILCS 240 (West 2010)) fines; and $30 traffic/criminal surcharge fine. The State concedes the clerk improperly imposed the above fines. We accept the State's concession, vacate the fines, and remand for the trial court to reimpose these fines. See *People v. Warren*, 2016 IL App (4th) 120721-B, ¶ 89; *People v. Castleberry*, 2015 IL 116916, ¶¶ 20-24, 43 N.E.3d 932. We leave intact the $2 State's Attorney automation fee and $10 fee for probation and court services department operations.

¶ 118 Finally, defendant is entitled to $1380 in presentence credit for the 276 days of time served. He may use the credit to offset creditable fines imposed on remand. We remand for the trial court to apply the monetary credit to eligible fines.

¶ 119 III. CONCLUSION

¶ 120 We affirm defendant's conviction for armed robbery and vacate the mandatory fines imposed by the circuit clerk. We remand for the trial court, and not the circuit clerk, to

reimpose the mandatory fines vacated herein and apply defendant's statutory credit against creditable fines. We direct the parties to provide copies of their briefs on appeal to the trial court and the circuit clerk on remand. We further direct our clerk to provide an extra copy of our disposition directly to the attention of the clerk of the circuit court. As part of our judgment, we award the State its $75 statutory assessment against defendant as costs of this appeal. 55 ILCS 5/4-2002 (West 2012).

¶ 121      Affirmed in part and vacated in part; cause remanded with directions.