NOTICE
This order was filed under Supreme
Court Rule 23 and may not be cited
as precedent by any party except in
the limited circumstances allowed
under Rule 23(e)(1).

2020 IL App (4th) 180527-U

NO. 4-18-0527

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
November 16, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Champaign County |
| RIO M. FRANKLIN, | ) | No. 17CF511 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Heidi N. Ladd, |
| | ) | Judge Presiding. |

_____

JUSTICE HOLDER WHITE delivered the judgment of the court. Presiding Justice Steigmann and Justice Cavanagh concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The appellate court affirmed, concluding the trial court (1) did not abuse its discretion in admitting lay witness identification testimony, (2) did not err in considering defendant's demeanor as a factor in sentencing defendant to 25 years' imprisonment, and (3) conducted an adequate *Krankel* inquiry into defendant's posttrial ineffective assistance of counsel claim.

¶ 2    Following a May 2018 trial, a jury found defendant, Rio M. Franklin, guilty of aggravated robbery (720 ILCS 5/18-1(b)(1) (West 2016)).  In June 2018, the trial court sentenced defendant to 25 years' imprisonment.

¶ 3    Defendant appeals, arguing (1) the trial court erred by requiring jurors to watch the surveillance video in the courtroom and for instructing them that they were not to deliberate while the video was being played, (2) the trial court erred by allowing Ramsey Rusef to identify defendant from still photographs taken from the surveillance

video, (3) defendant's case should be remanded for a new sentencing hearing where the court considered his demeanor during trial as an aggravating factor at sentencing, and (4) defendant's case should be remanded for an adequate *Krankel* inquiry. We affirm.

¶ 4                                    I. BACKGROUND

¶ 5        In April 2017, the State charged defendant with aggravated robbery (720 ILCS 5/18-1(b)(1) (West 2016)), alleging "defendant took property from Rebecca Stuckey by threatening the imminent use of force while indicating physically that he was armed with a firearm[.]" The charge stemmed from a February 25, 2017, robbery at a Circle K gas station in Urbana, Illinois.

¶ 6                                A. Pretrial Proceedings

¶ 7        In May 2018, the State filed a motion *in limine* pursuant to *People v. Thompson*, 2016 IL 118667, 49 N.E.3d 393, asking the trial court to hold a hearing outside the presence of the jury to address the issue of admissibility of lay opinion identification testimony of Illinois Department of Corrections (DOC) Parole Agent Ramsey Rusef. The State sought to introduce Rusef's testimony as to his identification of defendant from an image taken from a Circle K gas station surveillance video.

¶ 8        According to the State's motion, a robbery occurred at a Circle K gas station on February 25, 2017. Video surveillance captured a black male "enter the Circle K gas station and proceed to rob clerk Rebecca Stuckey, during which the offender points what appears to be a gun at Stuckey, secures her hands behind her back with zip[]ties, and attempts to gain access to cash registers and a safe." "Pursuant to the investigation of the robbery, on April 13, 2017, [DOC] Parole Agent Ramsey Rusef viewed still photographs taken from the Circle K surveillance video depicting the robbery. In

reviewing said still images, Agent Rusef recognized and identified Defendant Rio Franklin as the offender in the video." Rusef previously met with defendant on March 8, 2017, in his capacity as defendant's parole officer.

¶ 9        Subsequent to the filing of the motion *in limine*, the trial court held a hearing on the motion. At the hearing, Rusef testified he met with defendant, in his official capacity as a parole agent, on March 8, 2017, for 45 minutes, at defendant's girlfriend's residence. On April 13, 2017, the Urbana Police Department contacted Rusef and asked him to view photographs on the Champaign County Facebook page to attempt to identify defendant as the suspect in the February 2017 aggravated robbery.

¶ 10        The State asked Rusef if he recognized the person in the photographs on the Facebook page. Rusef responded, "I actually consulted—I had to consult with the DOC web page because I'd only seen [defendant] one time prior." After Rusef viewed defendant's photograph on the DOC website and the still photograph from the surveillance video on the Facebook page, he stated, "it definitely could be [defendant]." Rusef explained, "[Defendant] has a very distinctive cheek bone and right around his eyes is a very distinct high cheek bone that was present in the pictures from the Circle K as well as the DOC website."

¶ 11        The trial court heard arguments from both parties and analyzed Rusef's lay opinion testimony pursuant to the factors in *Thompson* and *People v. Mister*, 2016 IL App (4th) 130180-B, 58 N.E.3d 1242. In analyzing the factors set out in *Thompson*, the court stated, "Both parties have argued the factors set forth in *Thompson*, and it is a totality of the circumstances, the absence of any particular factor does not necessarily render the testimony inadmissible." The court found *Mister* "held that a lay witness may

testify regarding the identity of a person depicted in a surveillance video if there is some basis for concluding that the witness is more likely to correctly identify that individual than the jury, adopting obviously the directives of *Thompson*. Also, that the lay witness's familiarity with a person then goes to the weight to be given to the witness's testimony, not admissibility of such testimony."

¶ 12 Ultimately, the trial court granted the State's motion to admit Rusef's lay opinion testimony. In support of its ruling, the court stated,

"I find here that in weighing all of [the] factors then there is sufficient evidence that this should go to the jury and it is for them to determine what weight, if any, to be given to them. The certainty of witness identification is one that both by statute, 725 ILCS 5/115-5, and Illinois Rule of Evidence [801(d)(1)(B)] is for the trier of fact to evaluate, including the level of certainty in making the identification. So that would be something for the trier of fact, but not bar its admission.

Having weighed all of these factors, I think that a prophylactic ruling, which the state is conceding is necessary, would then address any of the concerns about the prejudicial value, and that is that the state would be barred from making any reference to the occupation of Agent Rusef or the fact that he works as a parole officer or for the [DOC]. He obviously could testify to the time,

place and circumstances of the meeting in the sense of who was present, how far away, where they stood, conversation took place, observations he made. Any testimony as to photographs he reviewed other than the stills made from the videotape would absolutely have to redact any reference to booking photographs or records or anything from the [DOC] and simply be photographs in the witness's possession or that he was familiar with, but he cannot make any reference to where they were stored or how he had access to those or what type of photographs they were.

With those prohibitions then, I believe that the evidence can be admitted and the probative value is not substantially outweighed by the danger of unfair prejudice. That would cure the danger of unfair prejudice. And, again, any other issues would go to the weight to be given to it."

¶ 13                                    B. Defendant's Jury Trial

¶ 14        Below, we summarize the relevant testimony elicited during defendant's May 2018 jury trial.

¶ 15                                    1. *Rebecca Stuckey*

¶ 16        Rebecca Stuckey, the victim, testified that on February 25, 2017, she worked at the Circle K gas station in Urbana. Around 3 a.m., "[a] younger, black gentleman about [Stuckey's] height" with "a black hoodie on," "a mask and black blue

- 5 -

jeans and rubber gloves" walked into the gas station. The man pointed a gun at Stuckey, bound her hands with zip ties, and took money and stuff from out of the registers. Stuckey also testified the man took her engagement ring. After the man fled from the gas station, Stuckey waited a few seconds then pushed the panic button and called 911.

¶ 17 Stuckey recounted that during the robbery, the man asked her about the last time she made a "drop." Based on this question, Stuckey took that to mean a "money drop" and testified the man may have worked in the gas station industry. Stuckey explained "drops" are made regularly during a shift and someone who spent time in the store would be able to observe the process.

¶ 18 The State played the Circle K surveillance video from February 25, 2017, for the jury. Stuckey testified the video fairly and accurately depicted the Circle K gas station on February 25, 2017.

¶ 19 *2. Officer Matthew McKinney*

¶ 20 Matthew McKinney, a police officer with the Urbana Police Department, testified that on February 25, 2017, he responded to a call around 3 a.m. reporting an armed robbery at the Circle K at 507 West University in Urbana. When he arrived at the Circle K gas station, Officer McKinney observed "the clerk inside. She was visibly shaking. She was crying." Officer McKinney cut the zip ties from Stuckey's wrists and took possession of the store surveillance video.

¶ 21 *3. Detective Doug Pipkins*

¶ 22 Doug Pipkins, a detective with the Urbana Police Department, testified he was assigned as the lead detective on the February 25, 2017, Circle K robbery. After the robbery, Detective Pipkins worked potential leads for several weeks. On March 29,

2017, Detective Pipkins developed defendant as a possible suspect. Once Detective Pipkins developed defendant as a suspect, he contacted Rusef to look at some photographs taken from the video surveillance of the robbery. Detective Pipkins told Rusef he believed defendant was depicted in the photographs.

¶ 23                    4. *Officer John McAllister*

¶ 24           John McAllister, an officer with the Champaign Police Department, testified that on the morning of March 29, 2017, he encountered defendant in the downtown business district of Champaign, Illinois. Officer McAllister observed defendant "wearing dark clothing with a ski mask pulled down kind of covering his neck area." Officer McAllister recalled it was a sunny spring day and defendant "seemed to be wearing clothing that was inappropriate given how warm it was." Defendant also carried a bookbag with him.

¶ 25           Officer McAllister spoke with defendant and defendant allowed Officer McAllister to look inside his bookbag. Officer McAllister recalled defendant's bookbag contained "zip ties, fasteners that had been closed and doubled together to make what people call flex cuffs. They use them for quickly binding people's hands and feet." Officer McAllister looked at People's Exhibit 5, the zip ties used to bind Stuckey's wrists, and testified those zip ties were "extremely similar in both color and thickness" to the zip ties he observed in defendant's bookbag.

¶ 26                    5. *Ramsey Rusef*

¶ 27           Prior to Rusef's testimony, the trial court read the following jury instruction: "Evidence will be received from a witness as to the identity of a person

whom the witness observed in a video recording. It is for you to determine what weight, if any, should be given to such evidence."

¶ 28        Rusef then testified he met with defendant on March 8, 2017, for about 45 minutes at the home defendant shared with his girlfriend. Also present was Rusef's coworker, Christopher Shive. Rusef recalled that when he and defendant met defendant's face was not covered, but Rusef could not remember what defendant wore that day.

¶ 29        On April 13, 2017, Detective Pipkins contacted Rusef and asked him to look at two still shot photographs from the gas station surveillance video. Rusef viewed the photographs on his cellular telephone. At the time Rusef viewed the photographs, his coworker, Shive also viewed the photographs. When asked how Rusef viewed the photographs on Facebook, Rusef responded, "Through my coworker, Agent Shive, and— oh, my coworker, Christopher Shive, and I were in—in our vehicles and we both looked at it on our cell phones."

¶ 30        Rusef compared the person in the still shot photographs with another photograph of defendant. Rusef testified all the photographs he viewed captured defendant's face from both the front and side profile. Rusef represented there was "a strong possibility" defendant was the man in the screen shots. Rusef suggested defendant possesses "a very distinctive set of cheekbones[.]"

¶ 31                                6. *Stipulations*

¶ 32        The parties presented stipulations to the jury that on April 24, 2017, police officers searched defendant's girlfriend's apartment which she shared with defendant and her seven-year-old daughter in Naperville, Illinois, on two occasions. Defendant's girlfriend consented to the first search where officers seized a pair of Nike ACG Air

Zoom Tallac Lite shoes with a yellow embellishment on the back. The second search, performed after officers obtained a search warrant, produced a black Puma sweatshirt.

¶ 33    The parties also stipulated to the jury that officers sent the zip ties used on Stuckey for deoxyribonucleic acid (DNA) testing. The Illinois State Police Crime Laboratory found a mixture of three people's DNA on the zip ties but excluded defendant as someone who contributed to that mixture.

¶ 34    7. *Christina Calvin*

¶ 35    Christina Calvin, defendant's girlfriend, testified that in February 2017, she lived in an apartment at 1348 Crab Apple Court with defendant and her seven-year-old daughter. On February 24, 2017, at 10:45 p.m., Calvin left her apartment to go to work. When Calvin left for work, defendant and her daughter remained at the apartment. The next morning around 7 a.m., Calvin returned home from work to defendant and her daughter in the apartment. Calvin testified she left her daughter with defendant while she went to work. Further, Calvin testified defendant did not have a valid driver's license or a vehicle. Calvin never knew defendant to work in a convenience store.

¶ 36    8. *Verdict*

¶ 37    At the close of the trial, the court instructed the jury as follows: "Evidence has been received from a witness as to the identity of a person whom the witness observed in a video recording. It is for you to determine what weight, if any, should be given to such evidence."

¶ 38    After deliberations, the jury found defendant guilty of aggravated robbery.

¶ 39    C. *Krankel* and Sentencing Hearing

¶ 40    In June 2018, defendant filed a motion for a new trial. The motion, in relevant part, alleged the trial court erred in granting the State's motion *in limine* to admit Rusef's identification testimony. At the June 2018 sentencing hearing, the court denied defendant's motion for a new trial.

¶ 41    Before proceeding to sentencing, defense counsel brought several *Krankel* claims to the court's attention. According to defense counsel, defendant faulted her where she (1) failed to file a motion to suppress evidence found during the execution of a search warrant in Naperville, (2) failed to object when Rusef used the word "agent" during his testimony to describe his coworker, (3) stipulated to the crime lab testimony, (4) failed to object to the continued deliberations by the jury and the instruction to continue to deliberate, and (5) should have objected to the DOC photo being entered into evidence. Defense counsel explained most of the issues defendant raised related to trial strategy. When given the opportunity, defendant declined to add anything to his attorney's statements and told the trial court he believed defense counsel covered everything.

¶ 42    The trial court considered the representations made by defense counsel on defendant's behalf. The court found defense counsel provided effective representation stating,

> "[Defense counsel] very effectively and vigorously
> represented her client throughout these proceeding, made
> the appropriate motions, objections, and was competent,
> professional, prepared and responsive throughout, reflected
> a well thought out strategy and tactical decisions.

I find that the complaint that she's raised her[e] addresses those. There are no grounds for a motion to suppress, and I would note the [d]efendant was on parole at that time. So, he was subject to search by parole agents at any time, of any residence he was living in. So, there were no grounds to suppress the evidence or any items that were seized from his apartment by the parole officers.

The decision as to whether or not there was mention of another agent is a tactical and strategic decision as [defense counsel] has indicated.

With regards to stipulation to the labs, that's another tactical and strategic decision.

With regards to specific objections, as to continuing to instruct the jury, that is a tactical decision. And frankly, had there been an objection, it would have been overruled because the jury had only been deliberating two and a half hours and it wouldn't have mattered if [defense counsel] had objection, I still would have instructed them to continue to deliberate at that juncture. They were not in any way pressured or coerced to reach a verdict, and it was very soon in the proceedings when they felt that they were deadlocked. That's, in fact, the Court's ordinary practice is to continue to have jurors deliberate.

With regards to the photograph, it was not unduly highlighted. [Defense counsel] made a tactical decision. And again, that was—fell well-within the ambit of what is tactical strategy and decisions.

Reviewing all the concerns that have been raised to the Court, I find they all fall into the analysis of what pertains to trial strategy and tactical decisions. They're all well-founded. They represent effective representation and well-thought out representation. And there's no grounds then to support any request that separate counsel be appointed for these proceedings. So, I do find [defense counsel] did provide effective representation. Any request to vacate [defense counsel's] assignment to the case and have a different attorney proceed at this point is not well-founded and would be denied."

¶ 43    The court then proceeded to sentencing. The State called two witnesses to testify in aggravation.

¶ 44    Patrick Funkhouser, an investigator with the Champaign Police Department, testified he investigated a March 26, 2017, armed robbery at a Circle K gas station on Prospect Avenue in Champaign, Illinois. Officer Funkhouser responded to the call shortly after midnight on March 26, 2017, and spoke with the victims, clerk Brandy Willis and Ava Nash. Both women told Officer Funkhouser a black male, wearing dark clothing and a mask that partially covered his face entered the store and proceeded to rob

Willis and Nash. A surveillance video showed a male enter the store unmasked, pull up his mask as he approached the counter, display a handgun, steal money and a necklace from Willis, and then steal cash from Nash when she, an unknowing customer, walked into the store.

¶ 45        Officer Funkhouser assembled two different photo line-ups and showed them to Willis and Nash individually. Willis picked defendant out of the line-up but stated she "wasn't a 100% certain." Nash identified another individual in the line-up as the perpetrator.

¶ 46        Detective Pipkins testified he investigated an April 9, 2017, burglary at a Metro PCS store on North Cunningham Ave in Urbana. Police discovered a window had been broken out and approximately 30 cellular phones were stolen from the store. A few weeks later, police executed a search warrant for defendant's car and apartment and discovered 17 of those cellular phones.

¶ 47        In mitigation, defense counsel provided two letters to the court. The court took into consideration the two letters and a victim impact statement. Subsequently, the parties presented their sentencing recommendations. The State sought a 25-year prison sentence. Defense counsel urged the court to sentence defendant to a minimum sentence. Defendant declined to make a statement in allocution.

¶ 48        The trial court sentenced defendant to 25 years' imprisonment, followed by 3 years of mandatory supervised release. In sentencing defendant, the court, in relevant part, stated,

                    "This Court has considered the presentence report

                    of Court Services, the victim impact statement, the

- 13 -

documents tendered in mitigation, all relevant statutory factors, including but not limited to the nature and circumstances of the offense, the evidence and applicable factors in aggravation and mitigation, the character, history and rehabilitative potential of the [d]efendant, the arguments and recommendations of counsel."

¶ 49        In mitigation, the court considered defendant's family situation, his criminal history, his level of education, and his employment history. In aggravation, the court considered the nature and circumstances of the offense, the level of harm to the victim, defendant's demeanor at trial, deterrence, and the protection of the public. Specifically, the court stated, "The most significant evidence in aggravation is from the nature and the circumstances of the offense." The court found, "The most compelling factor also becomes not only deterrence but safety and protection of the public." The court discussed the specific facts of the case and found "[t]he effects on Ms. Stuckey were profound."

¶ 50        With regard to defendant's demeanor, the court stated,

            "I would also note that the tape was played in open
            court for pretrial motions, as well as during the trial. The
            [d]efendant was able to watch the tape, and the Court was
            able to watch the [d]efendant's reaction and it was telling.
            He leaned forward, he had a smile on his face, and the
            Court's immediate impression was that he was detached
            and self-satisfied. He appeared to be admiring his own

- 14 -

handiwork as he watched her screaming for what she thought was her life. I didn't see any regret, any shame or any remorse."

¶ 51 Ultimately, the court determined:

"He's been given multiple opportunities for probation and community monitoring as a juvenile and as an adult. He has two firearms convictions. He escalated from a Class IV to a Class II, and he was on a parole for residential burglary, a Class I felony. It is difficult to find any meaningful rehabilitative potential, and certainly the Court cannot glean any assurance that the [d]efendant will not repeat his offense and nothing yet has deterred or rehabilitated him. It is dangerous conduct that is escalating in its seriousness.

The Court has determined then that this is a Class I felony. The [d]efendant was admonished that it would require mandatory Class-X sentencing. And, in fact, the record confirms that.

Having regard to the nature and circumstances of the offense, and to the history, character and rehabilitative potential of the [d]efendant, I do find that a significant period of imprisonment is necessary for the protection of the public and a community based sentence would

depreciate the seriousness of the [d]efendant's conduct and

be inconsistent with the ends of justice."

¶ 52                                D. Motion to Reconsider

¶ 53          In July 2018, defendant filed a motion to reconsider his sentence. Defendant claimed his sentence was excessive and the trial court gave too much weight to the deterrence factor. On July 26, 2018, the court denied defendant's motion to reconsider.

¶ 54          Also on July 26, 2018, defendant filed a notice of appeal. On July 30, 2018, defendant filed a *pro se* notice of appeal which set forth additional claims alleging his attorney was ineffective.

¶ 55          This appeal followed.

¶ 56                                II. ANALYSIS

¶ 57          On appeal, defendant argues (1) the trial court erred by requiring jurors to watch the surveillance video in the courtroom and for instructing them that they were not to deliberate while the video was being played, (2) the trial court erred by allowing Ramsey Rusef to identify defendant from still photographs taken from the surveillance video, (3) defendant's case should be remanded for a new sentencing hearing where the court considered his demeanor during trial as an aggravating factor at sentencing, and (4) defendant's case should be remanded for an adequate *Krankel* inquiry. After defendant filed his briefs on appeal, he filed a motion to withdraw argument I of his brief pursuant to the Illinois Supreme Court's decision in *People v. Hollahan*, 2020 IL 125091. This court granted defendant's motion to withdraw argument I. Thus, we address the remaining issues in turn.

- 16 -

¶ 58                    A. Lay Witness Identification Testimony

¶ 59            Defendant first argues the trial court erred in allowing Rusef to testify to the identification of defendant from still photographs taken from the Circle K gas station surveillance video. Specifically, defendant asserts Rusef was in no better position than the jury to identify defendant from the surveillance video photographs. The State disagrees and contends the trial court did not err in admitting Rusef's lay opinion identification testimony.

¶ 60            The Illinois Supreme Court in *Thompson*, 2016 IL 118667, addressed the admissibility of lay opinion identification testimony. The supreme court determined lay opinion identification testimony is admissible where "(a) the testimony is rationally based on the perception of the witness and (b) the testimony is helpful to a clear understanding of the witness's testimony or a determination of a fact in issue." *Id.* ¶ 50. As it related to an identification from a surveillance recording, the court found,

> "[l]ay opinion identification testimony is helpful where there is some basis for concluding the witness is more likely to correctly identify the defendant from the surveillance recordings than the jury. A showing of sustained contact, intimate familiarity, or special knowledge of the defendant is not required. Rather, the witness must only have had contact with the defendant, that the jury would not possess, to achieve a level of familiarity that renders the opinion helpful." *Id.*

¶ 61        The court adopted a totality of the circumstances approach that considers the following factors "in determining whether there is some basis for concluding the witness is more likely to correctly identify the defendant ***." *Id.* ¶ 51. The factors are:

> "[(1)] the witness's general familiarity with the defendant; [(2)] the witnesses' familiarity with the defendant at the time the recording was made or where the witness observed the defendant dressed in a manner similar to the individual depicted in the recording; [(3)] whether the defendant was disguised in the recording or changed his/her appearance between the time of the recording and trial; and [(4)] the clarity of the recording and extent to which the individual is depicted." *Id.*

¶ 62        However, the supreme court noted "the absence of any particular factor does not render the testimony inadmissible." *Id.* Further, the supreme court found "the extent of a witness's opportunity to observe the defendant goes to the weight of the testimony, not its admissibility." *Id.* ¶ 53. Even if admissible, the supreme court noted lay opinion identification testimony may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. *Id.* ¶ 54. Our court adopted this standard in *Mister*, 2016 IL App (4th) 130180-B, ¶¶ 71-73. We review the trial court's decision to admit lay opinion identification testimony for an abuse of discretion. *Id.* ¶ 73; *Thompson*, 2016 IL 118667, ¶ 53. "An abuse of discretion will be found only where the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable

- 18 -

person would take the view adopted by the trial court." *People v. Caffey*, 205 Ill. 2d 52, 89, 792 N.E.2d 1163, 1188 (2001).

¶ 63    The trial court relied upon *Thompson* and *Mister* in granting the State's motion *in limine* to admit the identification testimony of Rusef.  Specifically, the court analyzed Rusef's lay opinion identification testimony pursuant to the totality of the circumstances and the factors in *Thompson*.

¶ 64    The court found Rusef's general familiarity with defendant based on his 45-minute face-to-face conversation within two weeks of the offense and his observation of a photograph of defendant provided a basis to conclude he was more likely to be able to identify the person in the video than the jury.  The court referenced the holding in *Mister*, "that although the witness must be in a better position than the jurors to identify the individuals captured by the camera, this does not require the witness to have prior knowledge of those individuals[.]"  See *Mister*, 2016 IL App (4th) 130180-B, ¶ 67.

¶ 65    Further, the court found Rusef was more likely to be able to identify defendant than the jury where defendant's face was "obscured and disguised" in the video due to the way he had a hood pulled over his face.  The court determined Rusef's familiarity with defendant at the time the recording was made or whether defendant was dressed in a manner similar to the individual depicted in the recording did not apply to defendant's case.  The court also found the surveillance video to be clear.  After discussing each of the factors and their applicability to the facts presented, the court decided there was sufficient evidence Rusef's identification testimony could be presented to the jury with the jury to determine the weight to be given to the evidence.

- 19 -

¶ 66 Defendant argues the trial court's application and interpretation of the factors was improper where (1) Rusef's identification of defendant was not based on an observation he made during his 45-minute meeting with defendant but rather based on his observation of a photograph of defendant; (2) Rusef did not reference unique clothing defendant wore during their meeting or an uncommon feature that the jury would not be able to observe while defendant sat in the courtroom; (3) defendant was disguised during the robbery and defendant had not made any significant change to his appearance between the robbery, Rusef's meeting with defendant, and the trial; and (4) the surveillance footage was fairly clear.

¶ 67 We find based on the totality of the circumstances, the trial court's application of the *Thompson* factors to be reasonable. The absence of any one factor does not render the testimony inadmissible. See *Thompson*, 2016 IL 118667, ¶ 51. Here, Rusef's use of the DOC photos to assist in the identification process, and the relative brevity of Rusef's contact with defendant did not bar the admission of the evidence. A witness must only have had contact with the defendant that the jury would not possess, "[a] showing of sustained contact, intimate familiarity, or special knowledge of the defendant is not required." (Internal quotation marks omitted.) *Mister*, 2016 IL App (4th) 130180-B, ¶ 72.

¶ 68 Rusef's contact with defendant two weeks after the robbery and his analyzation of the DOC photograph compared to the still photograph taken from the surveillance video provided Rusef with a level of familiarity the jury did not possess. This was apparent where Rusef noted defendant's "very distinctive set of cheekbones[.]" Because Rusef's opinion testimony of defendant provided a level of familiarity the jury

did not possess, we find the trial court properly allowed Rusef's lay witness identification testimony to go to the jury.

¶ 69     Moreover, when the court admitted the identification testimony, it carefully balanced the probative value of admitting the evidence against the possible prejudice to defendant. See *Thompson*, 2016 IL 118667, ¶ 54. Specifically, the court took steps to minimize the potential prejudice to defendant by barring evidence Rusef knew defendant because of his status as defendant's parole officer. The court limited Rusef's identification testimony as to the time, place, circumstances, and duration of his encounter with defendant. The court also barred any reference by Rusef to the photographs he viewed of defendant being booking photographs or photographs obtained through the DOC website. Rather, Rusef could describe the DOC photographs as being "photographs in the witness's possession or that he was familiar with[.]"

¶ 70     Further, the trial court instructed the jury before Rusef testified and at the end of the trial that "Evidence [will be/has been] received from a witness as to the identity of a person whom the witness observed in a video recording. It is for you to determine what weight, if any, should be given to such evidence."

¶ 71     While the State presented other evidence connecting defendant to the robbery, such as a dark sweatshirt, a pair of Nike shoes, and zip ties, the video recording of the robbery in progress was an important part of the State's case. Thus, Rusef's testimony assisted the jury in identifying the person in the surveillance video where Rusef possessed knowledge of defendant the jury did not have and where defendant's face was partially obscured in the video. We find the probative value of admitting the evidence outweighed the prejudice to defendant. The trial court went to great lengths to

- 21 -

minimize the prejudice against defendant.  Further, as the court stated, it was up to the jury to determine the weight to be given to the evidence. See *id.* ¶ 53.  Therefore, the court did not abuse its discretion in granting the State's motion *in limine* admitting Rusef's lay opinion identification testimony.

¶ 72                                B. Improper Factor Considered at Sentencing

¶ 73            Defendant next argues his case should be remanded for a new sentencing hearing because the trial court erred in considering his demeanor during trial as an aggravating factor at sentencing.  The State disagrees and argues the trial court's consideration of defendant's demeanor was proper.

¶ 74            Initially, we note defendant failed to object at sentencing or raise this issue in his motion to reconsider sentence.  Thus, the issue is forfeited on appeal.  See *People v. Enoch*, 122 Ill. 2d 176, 186, 522 N.E.2d 1124, 1130 (1988).  Consequently, the trial court's sentencing decision will only be overturned if the defendant demonstrates plain error.  *People v. Hillier*, 237 Ill. 2d 539, 545, 931 N.E.2d 1184, 1187 (2010).

¶ 75            Under the plain-error doctrine, we first determine whether a clear or obvious error occurred.  *People v. Piatkowski*, 225 Ill. 2d 551, 565, 870 N.E.2d 403, 410-11 (2007).  If the reviewing court determines a clear or obvious error occurred, the second step is to determine whether (1) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error" or (2) the "error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence."  *Id.*  Thus, we turn to whether the trial court erred in considering defendant's demeanor at trial as a factor at sentencing.

¶ 76 "The trial court has broad discretionary powers in imposing a sentence, and its sentencing decisions are entitled to great deference." *People v. Alexander*, 239 Ill. 2d 205, 212, 940 N.E.2d 1062, 1066 (2010). " 'A reviewing court gives great deference to the trial court's judgment regarding sentencing because the trial judge, having observed the defendant and the proceedings, has a far better opportunity to consider these factors than the reviewing court, which must rely on the "cold" record.' " *Id.* (quoting *People v. Fern*, 189 Ill. 2d 48, 53, 723 N.E.2d 207, 209 (1999). "The trial court must base its sentencing determination on the particular circumstances of each case, considering such factors as the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age." *Fern*, 189 Ill. 2d at 53. We will not reverse a sentence absent an abuse of discretion. *People v. Snyder*, 2011 IL 111382, ¶ 36, 959 N.E.2d 656.

¶ 77 "A sentence based on improper factors will not be affirmed unless the reviewing court can determine from the record that the weight placed on the improperly considered aggravating factor was so insignificant that it did not lead to a greater sentence." *People v. Heider*, 231 Ill. 2d 1, 21, 896 N.E.2d 239, 251 (2008). Where we are unable to determine the weight given to an improper factor, we remand for resentencing. *People v. McCain*, 248 Ill. App. 3d 844, 853, 617 N.E.2d 1294, 1301 (1993).

¶ 78 Defendant argues the trial court improperly considered his demeanor during trial as an aggravating factor at sentencing where the court in sentencing defendant to 25 years' in prison stated:

"I would also note that the tape was played in open court for pretrial motions, as well as during the trial. The [d]efendant was able to watch the tape, and the Court was able to watch the [d]efendant's reaction and it was telling. He leaned forward, he had a smile on his face, and the Court's immediate impression was that he was detached and self-satisfied. He appeared to be admiring his own handiwork as he watched her screaming for what she thought was her life. I didn't see any regret, any shame or any remorse."

¶ 79    Defendant argues that while a defendant's remorse, or the lack thereof, is a proper subject for consideration at sentencing, a defendant's presumption of innocence remains with him at all stages of his trial. See *People v. Barrow*, 133 Ill. 2d 226, 281, 549 N.E.2d 240, 265 (1989); *People v. Balls*, 95 Ill. App. 3d 70, 77, 419 N.E.2d 571, 577 (1981). As a result, defendant asserts it was improper for the trial court to aggravate its sentence by referencing defendant's demeanor while he was cloaked with the presumption of innocence.

¶ 80    The State argues evidentiary standards used at sentencing are much less rigid than those used at the guilt-innocence phase of a trial. *People v. Adkins*, 41 Ill. 2d 297, 300, 242 N.E.2d 258, 260 (1968) ("In Illinois, too, we have long held that the judge in determining the character and extent of punishment is not limited to considering only information which would be admissible under the adversary circumstances of a trial."). The State also asserts such is consistent with the rule that great deference is given to a

- 24 -

court's sentencing determination because the trial judge, having observed defendant and the proceedings, had a better opportunity to weigh such factors as defendant's credibility, demeanor, general moral character, mentality, social environment, and habits.  See *Fern*, 189 Ill. 2d at 53.

¶ 81    The trial court in sentencing defendant considered "the presentence report of Court Services, the victim impact statement, the documents tendered in mitigation, all relevant statutory factors, including but not limited to the nature and circumstances of the offense, the evidence and applicable factors in aggravation and mitigation, the character, history and rehabilitative potential of the [d]efendant, [and] the arguments and recommendations of counsel."  Specifically, the court considered in mitigation, defendant's family situation, his criminal history, his level of education, and his employment history.  In aggravation, the court considered the nature and circumstances of the offense, the level of harm to the victim, defendant's demeanor at trial, deterrence, and the protection of the public.  The court emphasized three factors in aggravation as being significant when it stated "[t]he most significant evidence in aggravation is from the nature and the circumstances of the offense[,]" and "[t]he most compelling factor also becomes not only deterrence but safety and protection of the public."

¶ 82    The trial court's statements as a whole indicate the weight placed on defendant's demeanor at trial did not lead to a greater sentence.  Further, it was within the trial court's purview at sentencing to consider "such factors as the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age."  See *Fern*, 189 Ill. 2d at 53.  Because the trial court was in a better position to observe the defendant and weigh defendant's demeanor than this court, we find the trial court did not

- 25 -

abuse its discretion in sentencing defendant. Accordingly, defendant fails to demonstrate a clear or obvious error occurred.

¶ 83                                    C. *Krankel* Inquiry

¶ 84          Last, defendant argues the trial court failed to conduct an adequate inquiry into his claim of ineffective assistance of trial counsel pursuant to *People v. Krankel*, 102 Ill. 2d 181, 464 N.E.2d 1045 (1984). The State disagrees and argues the trial court conducted an adequate inquiry into defendant's claims of ineffective assistance of counsel.

¶ 85          A *pro se* posttrial motion alleging ineffective assistance of counsel is governed by the common-law procedure developed in *Krankel*. When a defendant presents a *pro se* posttrial claim of ineffective assistance of counsel, "a *pro se* defendant is not required to file a written motion but need only bring his or her claim to the trial court's attention." *People v. Roddis*, 2020 IL 124352, ¶ 35 (citing *People v. Ayers*, 2017 IL 120071, ¶ 11, 88 N.E.3d 732). "New counsel is not automatically appointed in every case when a defendant presents a *pro se* posttrial motion alleging ineffective assistance of counsel." *Id.* (citing *People v. Moore*, 207 Ill. 2d 68, 77, 797 N.E.2d 631, 637 (2003)). Rather, the trial court should first examine the factual basis of the defendant's claim. *Id.* "If the court determines that the claim lacks merit or pertains only to matters of trial strategy, then the court need not appoint new counsel and may deny the *pro se* motion." *Id.* "However, if the allegations show possible neglect of the case, new counsel should be appointed." *Id.*

¶ 86          During the *Krankel* inquiry, some exchange between the trial court and trial counsel regarding the facts and circumstances surrounding trial counsel's

representation is usually necessary in assessing what further action may be warranted on a defendant's claim. *Id.* ¶ 53. The trial court can " 'base its evaluation of the defendant's *pro se* allegations of ineffective assistance on its knowledge of defense counsel's performance at trial and the insufficiency of the defendant's allegations on their face.' " *Id.* (quoting *Moore*, 207 Ill. 2d at 79). Whether the trial court properly conducted a preliminary *Krankel* inquiry presents a legal question that we review *de novo*. See *id.* ¶ 33 (citing *People v. Jolly*, 2014 IL 117142, ¶ 28, 25 N.E.3d 1127).

¶ 87 Before proceeding to defendant's sentencing, defense counsel brought several *Krankel* claims to the trial court's attention. According to defense counsel, defendant faulted her where she (1) failed to file a motion to suppress evidence found during the execution of a search warrant in Naperville, (2) failed to object when Rusef used the word "agent" during his testimony to describe his coworker, (3) stipulated to the crime lab testimony, (4) failed to object to the continued deliberations by the jury and the instruction to continue to deliberate, and (5) should have objected to the DOC photo being entered into evidence. Defense counsel went on to explain most of the issues defendant raised related to trial strategy but declined to give a reason why she did not file a motion to suppress. The court then asked defendant if he had anything to add. Defendant declined to add anything to his attorney's statements and told the trial court he believed defense counsel covered everything.

¶ 88 The court then proceeded to analyze each of defendant's allegations in succession. Ultimately, the court concluded:

> "Reviewing all of the concerns that have been
>
> raised to the Court, I find they all fall into the analysis of

what pertains to trial strategy and tactical decisions. They're all well-founded. They represent effective representation and well-thought out representation. And there's no grounds then to support any request that separate counsel be appointed for these proceedings. So, I do find [defense counsel] did provide effective representation. Any request to vacate [defense counsel's] assignment to the case and have a different attorney proceed at this point is not well-founded and would be denied."

Moreover, the court further stated, "[Defense counsel] very effectively and vigorously represented her client throughout these proceedings, made the appropriate motions, objections, and was competent, professional, prepared and responsive throughout, reflected a well thought out strategy and tactical decisions."

¶ 89 Defendant claims the court failed to conduct an adequate inquiry into his claim defense counsel was ineffective for not filing a motion to suppress the items found in searches of his girlfriend's home. Specifically, defendant argues the court's inquiry was inadequate because defense counsel did not state and was not asked why she did not file a motion to suppress.

¶ 90 We find the trial court was not required to specifically ask defense counsel why she did not file a motion to suppress evidence found during the execution of a search warrant in Naperville. As stated above, some exchange between the trial court and trial counsel is necessary, but the court also can base its evaluation of defendant's allegations of ineffective assistance of counsel on its own knowledge of the defense counsel's

performance at trial and the insufficiency of defendant's allegations on their face. See *id.*

¶ 53. The court reasonably made its own determination that a motion to suppress was not required on the facts of the case. Specifically, the court stated, "There are no grounds for a motion to suppress, and I would note the [d]efendant was on parole at that time. So, he was subject to search by parole agents at any time, of any residence he was living in. So, there were no grounds to suppress the evidence or any items that were seized from his apartment by the parole officers."

¶ 91          Defendant argues the court's finding was improper because the evidence was not found by his parole officer. We disagree with defendant where police officers may properly conduct a search of a parolee's residence based on defendant's consent to searches as a condition of parole. See *People v. Wilson*, 228 Ill. 2d 35, 49-50, 885 N.E.2d 1033, 1042 (2008). Thus, the court's finding that there was no basis to challenge the search under the warrant where defendant was on parole was proper.

¶ 92          We find the court correctly limited its remarks to the search with a warrant. Defense counsel informed the court that defendant alleged she failed to file a motion to suppress evidence found during the execution of a search warrant in Naperville. When the court asked defendant if he had anything else to add to defense counsel's representations, defendant declined the opportunity.

¶ 93          Moreover, there was no basis to challenge the search that disclosed the Nike shoes. The parties stipulated that defendant's girlfriend consented to the search. Given the consent, such a motion to suppress would have been futile.

¶ 94          Based on the record, we find the trial court conducted an adequate *Krankel* inquiry into defendant's ineffective assistance of counsel claims.

¶ 95                                III. CONCLUSION

¶ 96          For the foregoing reasons, we affirm the trial court's judgment.

¶ 97          Affirmed.