2025 IL App (4th) 241015-U

NO. 4-24-1015

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

FILED
September 3, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Peoria County |
| DeMARKOE GRAYER, | ) | No. 23CF923 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Paul P. Gilfillan, |
| | ) | Judge Presiding. |

JUSTICE CAVANAGH delivered the judgment of the court.
Justices Knecht and DeArmond concurred in the judgment.

**ORDER**

¶ 1    *Held*:   (1) Because it is not ineffective assistance of counsel to refrain from making futile motions, defense counsel did not render ineffective assistance by refraining from moving for a directed verdict at the close of all the evidence—a motion that would have been properly denied.

(2) The evidence was constitutionally sufficient to support a finding that the element of knowledge, in the offense of unlawful possession of a weapon by a felon (720 ILCS 5/24-1.1(a) (West 2022)), was proven beyond a reasonable doubt.

(3) The statute defining the offense of unlawful possession of a weapon by a felon (*id.*) is not facially unconstitutional under the second amendment (U.S. Const., amend. II), made applicable to the states through the fourteenth amendment (U.S. Const., amend. XIV).

¶ 2    In the Peoria County circuit court, a jury found defendant, DeMarkoe Grayer,

guilty of one count of unlawful possession of a weapon by a felon (720 ILCS 5/24-1.1(a) (West

2022)). The court sentenced him to imprisonment for five years and six months. He appeals on

three grounds.

¶ 3       First, defendant claims that defense counsel rendered ineffective assistance by failing to move for a directed verdict at the close of all the evidence. We conclude, however, that if defense counsel had made that motion, the correct ruling would have been a denial. It is not ineffective assistance to refrain from making unmeritorious motions.

¶ 4       Second, defendant contends that the evidence was constitutionally insufficient to prove his *knowing* possession of the pistol in question. When we view all the evidence in the light most favorable to the prosecution, we conclude that a rational trier of fact could find, beyond a reasonable doubt, this element of knowledge.

¶ 5       Third, defendant claims that the statute defining the offense of unlawful possession of a weapon by a felon (*id.*) is facially unconstitutional under the second amendment (U.S. Const., amend. II). In numerous previous decisions, we have rejected that contention. We adhere to those previous decisions.

¶ 6       Therefore, we affirm the circuit court's judgment.

¶ 7                              I. BACKGROUND

¶ 8                         A. The Discovery of the Pistol

¶ 9       Around 6 a.m. on November 18, 2023, a patrol officer with the Peoria Police Department, Bryce Taylor, went to Springdale Avenue in Peoria, Illinois, to investigate a reported hit-and-run in which a vehicle had sideswiped a parked vehicle before driving away. Within a block of the struck vehicle, Taylor saw what appeared to be the offending vehicle. It was parked on the side of the street, with its interior lights on and its engine running, and defendant was in the driver's seat, asleep. After waking defendant up and having him exit the vehicle, Taylor searched the vehicle and found, under the driver's seat, a pistol.

¶ 10    Before moving the pistol or touching it, Taylor stood approximately by the driver's side mirror and, looking down at the driver's seat through the open driver's side window, took a photograph of the small portion of the pistol that was protruding from under the driver's seat. This photograph is People's exhibit No. 4.

¶ 11                    B. The Prior Felony Conviction

¶ 12    The parties stipulated that defendant "was convicted of a felony offense on January 7th of 2013" and that he "remained a convicted felon on November 20th, 2023."

¶ 13                    C. The Lack of Fingerprints or DNA Evidence

¶ 14    Another Peoria police officer, Kenneth Lopez, a member of the crime scene unit, found no latent fingerprints on the pistol that were suitable for comparison. Although he also swabbed the pistol for DNA, he never sent the swabs to the Illinois State Police Forensic Science Laboratory in Morton, Illinois, for analysis. When asked why he had not done so, he explained, "At the time I did not have standards for the swabs to be compared to, and the State Police Crime Lab will not accept those touch DNA swabs due to the charges." In fact, even with standards, he testified, "The state police will still not accept it *** because of the charge."

¶ 15                    D. Phone Calls From Jail

¶ 16    Brian Johnson worked for the Peoria County Sheriff's Office and was the assistant superintendent of the jail. One of his responsibilities in that position was to oversee the jail's telephone call system, which was administered by a company called ViaPath. Inmates using this system could communicate with people outside the jail by text messaging on tablets, video calls, or audio telephone calls. Except for conversations with attorneys, every telephone call an inmate made was recorded. Johnson could listen to these recorded telephone conversations and give password access to members of law enforcement so that they, too, could

listen to the recorded telephone conversations. Jail telephone calls could be looked up by the inmate's name, the telephone number the inmate had dialed, or the time or date of the call.

¶ 17    Johnson had listened to three recorded telephone calls relating to this case: clips 1, 2, and 3, as defendant calls them. Johnson identified People's exhibit No. 1 as a flash drive bearing his initials and containing clips 1, 2, and 3. The prosecutor was able to download jail telephone calls from "the website." Johnson had "set [her] up with passwords for the tablets, the video visits, and the phone calls." He had watched the prosecutor download clips 1, 2, and 3 from the website and onto the flash drive, and he had listened to the recordings as the prosecutor played them for him, including the part of each recording saying that "this is a phone call from the Peoria County Jail, which is a correctional facility, and it gives *** the person making the call the opportunity to say their name." Johnson could not remember, however, the name of the person who had made these telephone calls. All he could do in his testimony was verify that the telephone calls on the flash drive, People's exhibit No. 1, were the telephone calls he had witnessed the prosecutor look up on the website and play for him. He had "listened to the same phone call from the website that [he] did on the flash drive." Specifically, he had first listened to one recording on the flash drive, and then he had "listened to the same phone call on the website, [went] down to the next one, and [he] compared those, third one, compared those."

¶ 18    Taylor testified that he had had an opportunity to review the body camera video of the approximately 30-minute interaction he had with defendant at the scene on November 18, 2023, and that he also had had an opportunity to listen to the audio recordings of the telephone calls on the flash drive, People's exhibit No. 1. The prosecutor asked Taylor, "Based upon you being with the defendant for approximately 30 minutes as well as relistening to your body worn camera, do you have an opinion as to the male voices on the jail phone calls?" Taylor answered

- 4 -

that he did have an opinion: "[I]t was the defendant."

¶ 19    Taylor noted that, in clips 2 and 3 of People's exhibit No. 1, defendant made calls to the telephone number of his girlfriend, Ashley Edwards, but that in clip 1, defendant made a call to a telephone number ending in 1304, which was a telephone number different from that of Edwards. In clip 1, a man and a woman had the following conversation (we use the transcription in defendant's brief):

> "Man: Was that joint in your name? That I got from you?
>
> Woman: Yeah.
>
> Man: Was it registered?
>
> Woman: Yeah.
>
> Man: And you got your [firearm owners identification card (FOID)] card:
>
> Woman: Yeah."

The man then tells the woman that the gun was found under the seat in the car and that he is " 'going to need' " her. She responds, " 'oh, my f***ing god.' " He assures her that if she calls and acts firm, she will get the gun back.

¶ 20    E. The Motion for a Directed Verdict at the Close of the State's Evidence

¶ 21    At the close of the State's evidence, defense counsel made a motion for a directed verdict, without argument. Likewise, without making an argument, the prosecutor requested that the motion be denied. The circuit court denied the motion.

¶ 22    F. Defendant's Testimony

¶ 23    Defendant chose to testify in his own behalf, and he gave substantially the following account.

¶ 24    As of November 18, 2023, when defendant was arrested, Edwards had been his

girlfriend for about three years, and he had been living with her at her residence on North Springdale Avenue for three to four months.

¶ 25 At about 12:30 a.m. on November 18, 2023, while Edwards was asleep, defendant took her car keys and her car, without her permission, so that he could go and have some drinks with friends. Unbeknownst to defendant (so he testified), Edwards's pistol was in her car. After being gone for about three to four hours, defendant thought he should return so that Edwards could leave for work at 5 or 6 a.m. On his way back to her house, he bumped a neighbor's truck but nevertheless drove on. He parked in front of Edwards's house and fell asleep in the car.

¶ 26 A police officer awoke defendant and asked him about a hit-and-run. Defendant responded that because he was right there, he had not run. The police officer had defendant get out of the car, found some cannabis in a search of defendant's person, and then, in a search of the car, found the pistol. Defendant explained to the police officer that the pistol and the car belonged to his girlfriend, Edwards, and that he had been unaware that the pistol was in her car.

¶ 27 On cross-examination, defendant testified that the first telephone call in People's exhibit No. 1 was a call he made to Edwards, whom he had reached by dialing her daughter's telephone number, "the 453 number." In clip 1, the woman he was talking to was Edwards, according to defendant's testimony. When discussing with Edwards (in clip 1) what had been found under the car seat, "it wasn't the firearm I was talking about," he testified, but, rather, "I was insinuating the joint," meaning "the marijuana," the "majority of" which had been "found underneath the seat." He added, "It was a rolled up blunt. They found the bag of marijuana on my person."

¶ 28 Then there was the following dialogue between the prosecutor and defendant:

"Q. Okay. So, the entire phone call says, if you have your FOID card, you can take it and get the joint back, correct?

A. Yeah."

¶ 29                              G. Edwards's Testimony

¶ 30          The defense also called Edwards, who testified essentially as follows.

¶ 31          She moved into the house on Springdale Avenue in April 2023, and defendant, who had been her boyfriend for eight years, moved in with her.

¶ 32          Around 8 or 9 p.m. on November 17, 2023, when Edwards went to bed, defendant was downstairs playing a game. When Edwards awoke and got out of bed around 5 a.m. the next day, he was not in the house. She tried to find out where he was but was unsuccessful. She went back to bed at 7 a.m. An hour later, she learned that defendant was in jail.

¶ 33          Edwards owned the car that defendant drove on November 18, 2023. Defendant owned no car, and he lacked permission from Edwards to drive her car. She had a set of keys to her car. She denied that defendant had a set of keys to her car.

¶ 34          On November 18, 2023, Edwards had a valid FOID card and owned a gun: the pistol the police found under the driver's seat. At that time, however, she "probably" lacked "proof of ownership of a gun." However, according to Edwards, the pistol was hers. Because she went to work at Lowe's at 4:30 or 5 a.m. and because her daughter had been shot, Edwards had "a fear of something happening to [her]." For her safety, she stored the gun under the driver's seat of her car, with the car locked. She had slid the gun all the way under the driver's seat, and no one would have been able to "see the gun unless they went looking underneath the seat." She had never told defendant where she stored her gun. She had never told him she kept it under the driver's seat of her car. To her knowledge, he had been unaware where she kept her gun. She had

taken precautions to make sure he was not around her gun: that was why he was not supposed to drive her car. She added, on cross-examination, that another reason why she had forbidden him to drive her car was that he lacked a driver's license.

¶ 35 Edwards further testified, on cross-examination, that whenever defendant telephoned her from the jail, he did so by dialing her own telephone number, which ended in 6646. She denied that he ever called her from the jail on any other telephone number.

¶ 36 The prosecutor also cross-examined Edwards about the pistol. She testified that she owned only one gun, the pistol in question, which had been given to her "[m]aybe a year and a half ago." When the prosecutor asked Edwards who had given her the pistol, she answered that she could not remember. She had never registered the pistol, although she understood that, as the holder of a FOID card, she would have been able to register the pistol.

¶ 37 H. Clip 2

¶ 38 On cross-examination, Edwards and defendant were played clip 2 of People's exhibit No. 1. We will quote defendant's own description of clip 2:

"In Clip 2 of People's exhibit 1, [defendant] says 'F*** Kiki [or something similar], because she's taking too long.' He then says, 'like on Hanssler, same thing.' He then asks her to go visit his attorney with her FOID card to get him everything he needs and tells her that the police don't have fingerprints and that he told them about her keeping a gun for protection. At about 2 minutes, Ms. Edwards asks what to do about 'registration' and [defendant] tells her that is irrelevant and that it will be like on Hanssler."

¶ 39 When cross-examined regarding clip 2, defendant denied saying "Kiki" in that recording. He also denied knowing a "Mr. Hanssler." When asked what he had meant, then, by

"just like Hanssler," he explained, "Yeah, just like Hanssler where you have to show your identification and show your FOID card and show that this is yours."

¶ 40        Edwards also was asked, on cross-examination, to explain the significance of "Hanssler." On that subject, there was the following exchange between the prosecutor and Edwards:

"Q. Did you hear when it said, [']like on Hanssler,['] the same thing; did you hear that?

A. Yes.

Q. And that was you on that phone call, correct?

A. Yes.

Q. What's Hanssler?

A. My other address.

Q. I'm sorry?

A. My old address.

Q. What did you understand that to mean, [']just like on Hanssler?[']

A. Because he took my car and my gun was in my car—like it usually was in my car—and that happened on Hanssler Street.

Q. Okay. And did you write an affidavit for him on that case?

A. Yes.

Q. Okay. So, at that point you were also keeping your firearm in the car?

A. Yes."

¶ 41                        I. The State's Case in Rebuttal

¶ 42        In rebuttal, the State offered a certified copy of defendant's 2020 conviction of

unlawful possession of a controlled substance.

¶ 43    Both parties rested, and the defense made no oral motion.

¶ 44    On February 14, 2024, the jury found defendant guilty of the charged offense of unlawful possession of a weapon by a felon (720 ILCS 5/24-1.1(a) (West 2022)).

¶ 45                              J. The Posttrial Motion

¶ 46    On March 15, 2024, the defense filed a posttrial motion, which included the following claims:

> "3. During the course of the trial there were a number of errors that were made in the case causing the Defendant herein to request a new trial or judgment *N.O.V.*
>
> 4. The State failed to prove beyond a reasonable doubt the offense of 'Unlawful Possession of A Weapon By A Felon'.
>
> 5. It was error of the jury to return a verdict of guilty based upon the evidence presented at trial.
>
> 6. Further, it was error of the Court to deny Defendant's motion for a directed verdict and it was further error of the court at the close of all the evidence to deny Defendant's motion for a judgment of 'not guilty'."

The posttrial motion requested that the circuit court grant the following relief: "either vacate the trial order of February 14, 2024 and enter a judgment of 'not guilty', since the State failed to prove the allegations of Unlawful Possession Of A Weapon By A Felon or because of the errors committed by the Court at trial, or a new trial."

¶ 47    On April 10, 2024, the circuit court denied the posttrial motion and convened a sentencing hearing, at the conclusion of which the court sentenced defendant to imprisonment for

five years and six months. The court subsequently denied a motion to reduce the sentence.

¶ 48        This appeal followed.

¶ 49                                    II. ANALYSIS

¶ 50                        A. The Claim of Ineffective Assistance

¶ 51        Contrary to his posttrial motion, defense counsel did not move for a directed verdict *at the close of all the evidence*. Defense counsel moved for a directed verdict *at the close of the State's evidence*. Then, after the circuit court denied *that* motion, the defense presented evidence, thereby waiving any contention that the court had erred by denying the motion for a directed verdict at the close of the State's evidence. The supreme court has noted that "an election by the defendant to present evidence after a motion for directed verdict has been overruled waives any error in the trial court's ruling on the motion [citation], except when the defendant renews the motion at the close of all the evidence." *People v. Barrow*, 133 Ill. 2d 226, 249 (1989). Defendant complains that defense counsel did not "renew[ ] the motion" (*id.*), that is, he did not move for a directed verdict *at the close of all the evidence*. By that omission, defendant argues, defense counsel "fail[ed] to preserve the motion for directed verdict" and thereby rendered ineffective assistance.

¶ 52        Let us assume that "*renew*[*ing*] the motion" for a directed verdict that the defense made at the close of the State's evidence means requesting a reconsideration of the constitutional sufficiency of the State's evidence—not, additionally, of any evidence unfavorable to the defense that might have emerged afterward in the trial. (Emphasis added.) *Id.* In other words, let us assume that, in ruling on a motion for a directed verdict at the close of all the evidence, if defense counsel had made such a motion, the circuit court would have been limited to scrutinizing only the evidence the State adduced in its case-in-chief (the evidence that was the

subject of the earlier, denied motion for a direct verdict at the close of the State's case) and would have been required to disregard any inculpatory evidence that subsequently emerged on cross-examination in defendant's case or in the State's case in rebuttal. Let us assume that, by its use of the phrase "renews the motion" (*id.*), *Barrow* requires that procedure. But see *People v. Koger*, 287 Ill. App. 3d 764, 766 (1997) ("In reviewing a motion for a directed verdict, we must consider whether *all the evidence*, when viewed in the light most favorable to the State, fails to prove the defendant's guilt beyond a reasonable doubt." (Emphasis added.)); *People v. Turner*, 127 Ill. App. 3d 784, 790 (1984) ("When a motion for a directed verdict is made at the close of all the evidence, the proper standard on review is whether a verdict of not guilty should be granted where *all the evidence*, viewed in a light most favorable to the State, fails to establish defendant's guilt beyond a reasonable doubt." (Emphasis added.)). We are unconvinced that the evidence the State presented in its case-in-chief was constitutionally insufficient to support a conviction of unlawful possession of a weapon by a felon.

¶ 53 The appellate court has explained that "[t]he purpose of authorizing a motion for a directed verdict of not guilty is to provide an avenue by which a defendant can challenge the constitutional sufficiency of the evidence against him by moving the trial court to review the evidence and to direct a verdict of not guilty if the evidence does not meet the *** standard" in *Jackson v. Virginia*, 443 U.S. 307 (1979). *People v. Connolly*, 322 Ill. App. 3d 905, 915 (2001). The standard in *Jackson* is this: "In determining the constitutional sufficiency of the evidence, 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential element of the crime beyond a reasonable doubt.' " *Id.* at 914-15 (quoting *Jackson*, 443 U.S. at 319).

¶ 54 The only element of unlawful possession of a weapon by a felon that defendant

- 12 -

claims was unproven as a matter of law is his knowledge that the pistol was in Edwards's car when he was driving her car. "[T]he State had to prove that defendant *** had knowledge of the presence of the weapon." *People v. Ingram*, 389 Ill. App. 3d 897, 899 (2009). When we view the State's evidence in the light most favorable to the prosecution, however, we conclude that, given what defendant said to his female interlocutor in clip 1, a rational trier of fact could find, beyond a reasonable doubt, that defendant knew the gun was under the driver's seat because he put it there.

¶ 55           In that jail telephone conversation—in which it would have been risky to be too explicit—the term "that joint" could reasonably be understood as code for "that gun." Interpreting the "joint" as meaning, literally, a marijuana cigarette would make no sense. As the State points out, marijuana cigarettes are not "registered," nor does one need a "FOID card" to possess a marijuana cigarette. A gun, however, can be "registered," and one needs a "FOID card" to possess a gun. From the context of "that joint," a jury could reasonably understand "joint" as a substitute word for "gun." If "that joint" (that gun) was, as defendant said to the woman in the recording, one "[t]hat I got from you," he arguably *knew* that he had gotten the gun from her and, thus, knew of the presence of the gun in the car.

¶ 56           Granted, defendant has the argument that he said "that joint" instead of "that gun." Even so, "that joint," considered in the light most favorable to the prosecution, contextually signifies the pistol. It is unclear how defendant could have gotten, or obtained possession of, the pistol from the woman in clip 1 without knowing he was getting the pistol from her. Therefore, his knowledge of the pistol could reasonably be inferred.

¶ 57           Defendant argues, however, that in the State's case-in-chief, there should have been "better evidence" that he was the man speaking in clip 1. Defendant describes the voice

identification evidence as nothing more than Taylor's testimony "that he remembered [defendant's] voice because he spent about 30 minutes with him on the night of the arrest." But that description does not do justice to the evidence. Taylor did not rely solely on his memory of what defendant's voice sounded like. Rather, Taylor testified that his 30-minute interaction with defendant had been recorded by his body camera and that, not only had he listened to defendant live, at the scene, but he also had listened to the video from his body camera and had compared defendant's voice in the video to the male voice in clips 1, 2, and 3 of People's exhibit No. 1. According to Taylor, the voices matched. The jury had the right to believe him. Taylor's testimony could be reasonably accepted. Looking at the evidence in the light most favorable to the prosecution (see *Connolly*, 322 Ill. App. 3d at 914-15) means crediting Taylor's testimony.

¶ 58     Thus, even if defense counsel had moved for a directed verdict at the close of all the evidence and even if *Barrow* would have required the circuit court to limit its scrutiny to the evidence in the State's case-in-chief, the correct ruling would have been to deny the motion. Defense counsel did not render ineffective assistance by refraining from making a futile motion. See *People v. Hartfield*, 2022 IL 126729, ¶ 38.

¶ 59                    B. The Sufficiency of the Evidence

¶ 60     Defendant maintains that the evidence as a whole is constitutionally insufficient to prove his knowledge of the presence of the pistol in Edwards's car. We disagree. As we already have discussed in connection with clip 1, when the jury heard defendant's recorded admission that he "got" the pistol from the female interlocutor, the jury could reasonably infer that he knowingly got the pistol from her.

¶ 61     The jury could have further inferred, from what could have been perceived as falsehoods in his testimony, that defendant had a consciousness of guilt. See *People v. Mister*,

2016 IL App (4th) 130180-B, ¶ 113. That, by using the term "joint," defendant meant a marijuana cigarette, as he represented in his testimony, seems implausible in the immediate context in which he used that term. The jury could also have disbelieved defendant's testimony that the woman he spoke with in clip 1 was Edwards. The telephone call in clip 1 was not to Edwards's number, and as the State observes, Edwards testified that whenever defendant called her from jail, he called her at her own telephone number, not at anyone else's telephone number. The woman in clip 1 assured defendant that the pistol was registered, whereas Edwards testified that she had not registered the pistol—further suggesting (it could be argued) that Edwards and the woman in clip 1 were different persons.

¶ 62       For that matter, the jury could have disbelieved Edwards, too, when she testified that the pistol belonged to her, considering that she was unable to provide much of an explanation of how she had acquired the pistol. She testified that (1) the pistol was the only gun she owned, (2) someone gave her the pistol "[m]aybe a year and a half ago," and (3) she could not remember who gave her the pistol. A rational trier of fact could be skeptical that if the pistol really belonged to Edwards, she would be unable to remember who gave it to her a year and a half ago, especially considering her testimony that this pistol was the only gun she owned. So, contrary to Edwards's testimony, the pistol did not really belong to Edwards, the jury could have concluded—and the jury might have held that perceived falsehood against defendant as well. Then the question would have arisen, If the pistol did not belong to Edwards, whose pistol was it? The answer, the jury could sensibly find, was that the pistol belonged to the woman in clip 1 and that this woman had turned over possession of her pistol to defendant—in short, what was said in clip 1. When defendant had possession of Edwards's car, he knew that there was a pistol under the driver's seat because, after getting the pistol from the woman in clip 1, he himself

stashed the pistol under the driver's seat—or so a rational trier of fact could find.

¶ 63    In sum, then, when we view all the evidence in the light most favorable to the prosecution, we conclude that a rational trier of fact could find, beyond a reasonable doubt, defendant's knowledge of the presence of the gun in the car he was driving. See *Jackson*, 443 U.S. at 319; *People v. Cline*, 2022 IL 126383, ¶ 25.

¶ 64                         C. The Second Amendment

¶ 65    Defendant contends that, under the second amendment (U.S. Const., amend. II), as interpreted by *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), the statute under which he was convicted, section 24-1.1(a) of the Criminal Code of 2012 (720 ILCS 5/24-1.1(a) (West 2022)), is facially unconstitutional.

¶ 66    We recently rejected that contention, deeming ourselves bound by the judicial *dictum* in *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008), "that long-standing prohibitions on the possession of firearms by felons are constitutional." *People v. Montgomery*, 2025 IL App (4th) 240437-U, ¶ 37. In *People v. Burns*, 2024 IL App (4th) 230428, ¶ 21, the Fourth District held that the statute criminalizing unlawful possession of a weapon by a felon was facially constitutional. "[T]his court has reaffirmed our decision in *Burns* on numerous occasions." *People v. Blakes*, 2025 IL App (4th) 240998-U, ¶ 13 (citing cases). The Fourth District has "also rejected on multiple occasions" the argument that *United States v. Rahimi*, 602 U.S. 680 (2024), "requires we find the *** statute facially unconstitutional." *Blakes*, 2025 IL App (4th) 240998-U, ¶ 14 (citing cases). We adhere to our previous decisions and reject defendant's claim of facial unconstitutionality.

¶ 67                         III. CONCLUSION

¶ 68    For the foregoing reasons, we affirm the circuit court's judgment.

¶ 69        Affirmed.